**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

**KIRK D. JENKINS**

**Plaintiff,**

**v.** **Civil Action No. 2:07CV-263-J**

**NATIONAL BOARD OF MEDICAL EXAMINERS,**

**Defendant.**

**BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

**To the Honorable United States District Court Judge Mary Lou Robinson:**

Kirk D. Jenkins ("Jenkins") files his Brief in Support of Motion for Preliminary Injunction and respectfully states the following.

## I.
## Summary of Arguments

1. Jenkins has completed his second year of medical school at the University Of Louisville School of Medicine ("ULSOM") and is scheduled to take the United States Licensing Examination (USLME") Step 1 Exam, an examination that is a prerequisite to continuing medical school and to being licensed to practice medicine, ***in Amarillo on December 18, 2007***. The USMLE is administered nationwide by Defendant, the National Board of Medical Examiners ("NBME"). Jenkins requested the accommodation of extra time on the Step 1 Exam, but the NBME twice denied his request. As set forth below, Jenkins has learning disabilities recognized by the Americans with Disabilities Act ("ADA") and the NBME's refusal to accommodate Jenkins' disabilities is a direct violation of the ADA. Jenkins is entitled to the injunctive relief sought and his reasonable and necessary attorneys' fees.

## II.
## Factual Background

2. Jenkins has completed his second year of instruction at the ULSOM. As part of his preparation for the third year of medical school, Jenkins is required to take the USMLE Step 1. He has applied for and been given a scheduling permit allowing him to take the exam on December 18, 2007, in Amarillo. Jenkins is scheduled to begin rotations January 2, 2008. If he has not successfully completed the Step 1 by that time, Jenkins will not be allowed to join his classmates when rotations begin. Such an outcome would likely end Jenkins' medical education.

3. Jenkins' learning disabilities were evident since preschool, were formally diagnosed in the 3rd grade, and additional and repeat testing by clinical psychologists in 1999, 2003 and 2007, document and confirm his learning disabilities. Specifically:

4. **PRESCHOOL through KINDERGARTEN:** Jenkins' teacher noted that he had "difficulty learning names of letters and associating the letters with their sounds, when all of his other skills were above average." The other children in the classroom were "reading at a higher level" than Jenkins, and the teacher worked "one-on-one" with Jenkins, "often during recess and even after school." Throughout this process, Jenkins' teacher noted that he "showed additional traits of dyslexia – difficulty decoding single words, inaccurate and labored oral reading, slow reading, and difficulty learning the letters of the alphabet and names of numbers."

5. **ELEMENTARY SCHOOL:** Jenkins was referred for a learning disability assessment due to experiencing difficulties and frustrations with the academics of written language, spelling and reading. Accordingly, he was tested and evaluated by the school psychologist, Dr. Michael Gontarz. The battery of tests administered, and the results are attached to Jenkins' Original Complaint; briefly, Dr. Gontarz found that Jenkins "shows significant spelling weaknesses and some reading decoding problems, but ***compensates in the***

***latter when he must comprehend what is read.*"** Dr. Gontarz found that Jenkins "is in need of one to one, small group instruction in the area of spelling."

6. Dr. Gontarz was a part of a Multidisciplinary Team at Jenkins' elementary school whose purpose was to determine Jenkins' exceptional educational needs, if any. Other team members included the school principal, several of Jenkins' teachers and the school's Learning Disability Specialists, Lori TeeGarden.

7. The consensus of the Multidisciplinary Team, which, again, included Jenkins' teachers, the school psychologist and the school learning disability specialist, was that Jenkins "***did not possess the abilities to be a reader"*** and that "he was not proficient in the components of phonemic/phonics, fluency and sight work vocabulary. The Multidisciplinary Team agreed that Jenkins "was in need of one-to-one instruction to best meet his educational needs in reading and spelling" and that he ***could only remain in a regular reading class if provided "accommodations and extensive support services."***

8. Likewise, Jenkins' fourth grade teacher, who was a part of the Multidisciplinary Team, also recognized Jenkins struggling in the area of language arts and that, with respect to reading, he ***"still took extra processing time."*** The teacher allowed Jenkins extra time for completion of tests.

9. **TENTH GRADE:** Jenkins' tenth grade chemistry teacher noted that Jenkins would stay after class to finish his tests. ***"He did well on tests. It just took him a long time to finish them."***

10. **TWELFTH GRADE AND THE ACT EXAM:** During his senior year, Jenkins sat for the ACT Exam three times under normal time constraints, and received three low scores. Puzzled by the poor performance, the Jenkins family sought the assistance of a clinical psychologist.

11. Jenkins was evaluated by David R. Holmes, Ph.D. for complications related to his learning style. The battery of tests Dr. Holmes administered is set forth in his Psychological Report which is attached to Jenkins' Original Complaint; briefly, with respect to Jenkins' reading comprehension, Dr. Holmes recommended various strategies to improve Jenkins' reading, including ***"slow down the speed" and "seek extra time for tests involving significant elements of reading."***

12. The Dr. Holmes Report and the Dr. Gontarz Report supported Jenkins' request for extra time on a fourth try at the ACT Exam. With the accommodation of extra time, Jenkins' fourth ACT score was considerably higher than the three previous scores. ***Specifically, Jenkins' Reading score on the ACT Exam jumped from an unaccommodated 16 to an accommodated 35 (64th percentile to 99th percentile)***.

13. **THE UNIVERSITY OF WISCONSIN-MADISON:** Jenkins completed his undergraduate studies at the University of Wisconsin-Madison. While at the university, Jenkins, based upon his documented disability, received the following formal accommodations: ***"extended time on tests with up to time and a half,*** access to note-takers as needed, and access to a dictionary when taking a test."

14. **THE MCAT:** In his junior year at the University of Wisconsin-Madison, Jenkins was again tested and evaluated by Dr. Holmes. The battery of tests administered and the results are attached; briefly, Dr. Holmes found that Jenkins "reading comprehension score was in the 4th quartile while his reading score was in the 1st quartile. This is an atypical combination ***such that his reading speed is far below average while his comprehension is above average.***" "***Any task requiring reading with speed produced his lowest scores.***" Additionally, Dr. Holmes found that Jenkins ***"continues to be in need of accommodations related to the need for longer time for reading,"*** and "the nature of [Jenkins'] intracognitive discrepancies suggests that ***extended time***

***be allowed on timed tasks as an appropriate intervention***." Jenkins applied for and received the accommodations of ***"time and one-half with seating in a separate room"*** for the MCAT exam.

15. **ULSOM:** Following his undergraduate studies, Jenkins sought admission at the University Of Louisville School Of Medicine, where he has completed his second year and anticipates commencing his third year following the Step 1 Exam. While at ULSOM, Jenkins received formal accommodations on exams. Specifically, "as a result of [Jenkins'] definitive diagnosis [of dyslexia] he has always been supplied with accommodations ***(normally time and a half and a quiet environment to take the examinations)." "EXTENDED TEST TIME: Time and a half on written exams"***

16. **USMLE Step 1/THE FIRST REQUEST FOR ACCOMMODATION:** In anticipation of the Step 1 Exam., Jenkins wrote to the NBME requesting the accommodation of time and one-half on the exam. In support of his request, Jenkins advised NBME that he was given formal accommodations of extra time on exams by (1) ACT Universal Testing (the not-for-profit organization that administers the ACT); (2) the Association of American Medical Colleges (the not-for-profit organization that administers the MCAT); (3) The University of Wisconsin-Madison; and (4) The University of Louisville School of Medicine. Jenkins also advised NBME that he had been diagnosed with dyslexia in the third grade which resulted in a formal Independent Education Program (again, providing accommodations commensurate with Jenkins' disability), and that he had received extra time on exams throughout grade school and high school. Jenkins also enclosed the 1991 Dr. Gontarz Psychologist's Report, the 1999 Dr. Holmes Psychologist's Report, and the 2003 Dr. Holmes reevaluation and the related reports.

17. On December 7, 2006, NBME wrote to Jenkins and advised him that the information he had submitted was incomplete and asked him to "submit documentation of a current, comprehensive evaluation by a qualified diagnostician to demonstrate [Jenkins'] current

functioning." NBME specifically admonished Jenkins that the evaluator "should review and discuss the *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (DSM-IV-TR)* and the extent to which [Jenkins meets] the diagnostic criteria for each diagnosis."

18. **THE 2007 TESTING AND EVALUATION:** Pursuant to NBME's request, Jenkins was tested and evaluated by John M. Lacy, PhD., HSSP, a licensed clinical psychologist. The battery of tests administered by Dr. Lacy and the results and findings are set forth in his Psychoeducational Report, which is attached to Jenkins' Original Complaint. Dr. Lacy specifically diagnosed Jenkins as meeting the *DSM-IV* criteria for the following diagnoses: (1) Reading Disorder (315.00); Disorder of Written Expression (315.20); and Learning Disorder Not Otherwise Specified (i.e., low academic fluency)(315.90). With respect to the effect of such diagnoses, Dr. Lacy explained that, ***"As a lengthy test with a strict time limit that is presented in text form, the USMLE places Mr. Jenkins at a disadvantage relative to his knowledge of the material in question as a result of his low academic fluency and his reading decoding and written language disabilities."*** Dr. Lacy recommended that Jenkins "receive 50% additional time on the USMLE Step 1," thereby allowing Jenkins to be tested on his medical and science knowledge and not his disability. Jenkins provided the Dr. Lacy Psychoeducational Report to NBME.

19. **NBME's FIRST DENIAL OF ACCOMODATIONS:** On May 18, 2007, NBME advised Jenkins that it was unable to provide Jenkins with the requested accommodation of extra time for the Step 1 Exam. NMBE denied the requested accommodation notwithstanding the reports of every psychologist who had ever evaluated Jenkins, and with no testing or evaluation of its own.

20. **USMLE Step 1/THE SECOND REQUEST FOR ACCOMMODATION:** On June 18, 2007, Jenkins reapplied for the accommodation of additional time on the Step 1 Exam.

21. **NBME'S SECOND DENIAL OF ACCOMODATIONS:** On August 29, 2007, NBME again denied Jenkins the accommodation of extra time, claiming that Jenkins is not 'substantially limited in a major life activity relative to most people." Again, NBME made this decision without ever having met, tested or evaluated Jenkins.

22. **SUMMARY OF "HANDS-ON," "EYE-TO-EYE" PROFESSIONALS, TESTS AND RESULTS:**

**Dr. Michael Gontarz – January 1991**

a. Child Skills Checklist
b. Child Behavior Checklist
c. A.D.H.D. Rating Scale
d. Wechsler Intelligence Scale for Children-Revised
e. Coffman Tests of Educational Achievement
f. Test of Auditorial Perceptual Skills
g. Beery Developmental Test of Visual-Motor Integration
h. Culture Free Self-Esteem Inventory

**David R. Holmes, PhD. – October 1999**

a. Wechsler Adult Intelligence Scale-3rd Edition
b. Wechsler Individual Achievement Test
c. Outcome Questionnaire
d. Thurstone Word Fluency
e. Beck Depression Inventory-II

**David R. Holmes, PhD. – September 2003**

a. Wechsler Adult Intelligence Scale-III
b. DSM-4 Diagnosis-Axis 1: 315.90 Learning Disorder NOS (Principal)
c. Wechsler Individual Achievement Test-II

**John M. Lacy, PhD. HSPP – January 2007**

a. Wecshler Adult Intelligence Sale – III
b. Woodcock Johnson III

**The various foregoing tests measured and evaluated, among other things, Jenkins':**

a. Verbal IQ
b. Performance IQ
c. Full Scale IQ

d. Verbal Conceptual
e. Perceptual Organization
f. Working Memory
g. Processing Speed
h. Basic Reading
i. Mathematics Reasoning
j. Spelling
k. Reading Comprehension
l. Numerical Operations
m. Listening Comprehension
n. Oral Expression
o. Reading Composite
p. Mathematics Composite
q. Language Composite
r. Total Composite
s. Letter-Word Identification
t. Passage Comprehension
u. Reading Fluency
v. Broad Reading
w. Calculation
x. Mathematics Fluency
y. Spelling
z. Writing Samples
aa. Writing Fluency
bb. Broad Written Language
cc. Academic Skills
dd. Academic Fluency

23. It is absolutely critical to note that all of the foregoing diagnostic tests and evaluations were personally administered by licensed professionals. In other words, the diagnoses and evaluations were done by professionals who personally, hands-on, eye-to-eye, met with, observed, and tested Jenkins.

24. **The foregoing myriad of diagnostic tests and evaluations resulted in Jenkins meeting the DSM-IV criteria for the following diagnoses:**

a. Reading Disorder (315.00)

b. Disorder of Written Expression (315.20)

c. Learning Disorder Not Otherwise Specified (i.e., low academic fluency)(315.90)

25. Dating as far back as 1991, when Jenkins was in the third grade, a team of professionals including a psychologist and a learning disability specialist diagnosed Jenkins with dyslexia. Since then, other professionals and diagnosticians over the years have diagnosed, and continue to diagnose Jenkins with a learning disability that comports with the criteria of the DSM-IV.

26. Specifically, and covering the years from his third grade in school through the present, Jenkins psychologists, diagnosticians, and other learning disability specialists have consistently noted, among other things:

- Jenkins shows significant spelling weaknesses and some reading decoding problems, but compensates in the later when he must comprehend what is read.
- Jenkins did not possess the abilities to be a reader.
- Jenkins could only remain in a regular reading class if provided accommodations and extensive support services.
- Jenkins took extra processing time when reading.
- Jenkins did well on tests. It just took him a long time to finish them.
- Jenkins needs to slow down the speed of his reading and seek extra time for tests involving significant elements of reading.
- Jenkins should receive formal accommodations on timed tests of up to time and a half.
- Jenkins reading speed is far below average.
- Any tasks requiring reading with speed produces Jenkins lowest scores.
- Extended time should be allowed on all timed tasks for Jenkins as an appropriate intervention.
- Jenkins should receive time and one half with seating in a separate room.
- Jenkins is at a disadvantage relative to his knowledge of the material in question as a result of his low academic fluency and his reading decoding and written language disabilities.

27. ***IN SPITE OF NEVER HAVING MET JENKINS, NEVER HAVING TESTED JENKINS AND NEVER HAVING EVALUATED JENKINS, NMBE IGNORES MULTIPLE QUALIFIED PROFESSIONALS, YEARS OF TESTS AND EVALUATIONS, YEARS OF OBSEVATIONS AND, PERHAPS MOST IMPORTANTLY, THE OBJECTIVE AND UNASSAILALBE HISTORY OF JENKINS DISABLITY MANEFESTING WHEN TESTED WHERE READING WAS SUBSTANTIAL AND TIME WAS CONSTRAINED.***

28. Students at the ULSOM (as in many medical schools in the United States) are requested to take and pass the USMLE Step 1 before starting the third year of medical school. The third year of school consists of "rotations," i.e., medical education through the practical application of the principles learned in the classroom. ULSOM requests Step 1 be taken before the third year begins to avoid interfering with the third year studies. Passing the Step 1 is a prerequisite to completing the third year, obtaining residency admission, and being able to sit for the Step 2 and 3 examinations.

29. The NBME develops and administers the USMLE Step 1 at various test sites and on various dates throughout the United States. The results of each student's scores are reported to that student's medical school.

30. The NBME recognizes the right of disabled persons to accommodations by providing an application on which examinees can request test accommodations for the USMLE Step 1, including accommodations for learning disabilities like those suffered by Jenkins.

31. Students pay a fee and apply with NBME for an eligibility period (a three month time span) within which to take the Step 1. Exam. Jenkins was original eligibility period was from June 1, 2007 through August 31, 2007. When NBME denied both of his requests for reasonable accommodations, Jenkins paid an extra fee to extend his eligibility period to allow himself time to seek the Court's intervention in protecting his ADA rights. Due to NBME's

strict and unyielding rules, if Jenkins does not take the Step 1 Exam on his scheduled date of December 18, 2007, it will be impossible for him to take the exam before his third year rotations begin on January 2, 2008.

32. The facts establish that Jenkins has definite learning disabilities that substantially limit his major life activities of learning, reading and writing as compared to most people. Under the ADA, Jenkins is entitled to a reasonable accommodation of additional time to take the USMLE Step 1 exam. NBME's refusal to provide Jenkins with an accommodation of extra time for the USMLE Step 1, despite knowing of Jenkins' documented learning disabilities that are protected under the ADA, is a violation of Jenkins' rights under the ADA.

33. Jenkins will be unable to complete his medical school education in the same manner as his classmates if he does not successfully complete the USMLE Step 1. Moreover, he will be placed at a distinct disadvantage of competing for quality residency positions if he must take the exam without accommodation for his disability. In the worst case scenario, Jenkins's medical career and dream could end if he is unable to pass the USMLE Step 1, due to NBME's refusal to accommodate his disability as required by the ADA.

## III.
## Arguments and Authorities

### A. General Standard for Injunctive Relief.

34. The ADA was enacted in part, to provide "a clear and comprehensive national mandate for the elimination of discrimination …and to provide clear, strong, consistent, enforceable standards addressing discrimination…." 42 U.S.C. §12101(b)(1) and (2). The ADA specifically states that

> Any person that offers examinations or courses related to applications, licensing, or credentialing for secondary and post secondary education, professional, or trade purposes shall offer such examination or courses in a place and manner accessible to persons with disabilities or offer alternative accessible arrangements for such individuals. 42 U.S.C. §12189.

The ADA specifically includes the remedies set forth in 42 U.S.C. §2000a-3(a) for any violation of §12189, including preliminary and permanent injunctive relief. *See* 42 U.S.C. §12188(1)(a). Section 2000a-3(a) specifically provides that temporary or permanent injunctive relief is available as a remedy to persons aggrieved and to prevent further violations of law. 42 U.S.C. §2000a-3(a).

35. In general, the role of injunctive relief is to prevent a future harmful act and preserve the court's ability to render a meaningful decision on the merits. *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981); *FTC v. Southwest Sunsites, Inc.*, 665 F.2d 711, 719 (5th Cir.), cert. denied, 456 U.S. 973 (1982); *see also Tri State Generation & Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*, 805 F.2d 350, 355 (10th Cir. 1986) ("in issuing a preliminary injunction, a court is primarily attempting to preserve the power to render a meaningful decision on the merits.") (citing *Compact Van Equip., Co. v. Leggett & Platt, Inc.*, 566 F.2d 952, 954 (5th Cir. 1978)). Even though injunctive relief is an extraordinary remedy, courts grant the remedy when necessary to prevent irreparable injury and to preserve the plaintiff's ability to obtain meaningful judgment. *Productos Carnic, S.A. v. Central AM. Beef*, 621 F.2d 683, 686 (5th Cir. 1980). Preventing an ongoing violation of the ADA and reserving the ability to grant the protection authorized and guaranteed under the ADA clearly is within the realm of appropriate injunctive relief. *See* 42 U.S.C. §12188(a).

36. To obtain injunctive relief, the movant usually must show:

a. the movant will suffer irreparable injury unless the injunction is issued;

b. a substantial likelihood the movant will prevail at trial;

c. that the threatened injury to movant outweighs any harm to the defendant; and

d. that the injunction will not be adverse to the public interest.

*Women's Medical Ctr. of Northwest Houston v. Bell*, 248 F.3d 411, 419 (5th Cir. 2001); *Hoover*

*v. Morales*, 164 F.3d. 221, 224 (5th Cir. 1998). The ADA specifically states, however, that one available remedy for redressing ADA violations is injunctive relief. 42 U.S.C. §12188. By specifically providing a statutory cause of action for injunctive relief for violations of the ADA, it is not necessary for Jenkins to establish irreparable harm. *See U.S. v. White*, 893 F.Supp. 1423 (C.D. Cal. 1995). Nevertheless, there is no adequate remedy at law and Jenkins will be irreparably harmed by denial of the injunctive relief. *See Cho v. Itco, Inc.*, 287 F.Supp. 1183 (E.D. Tex. 1991).

**B. Jenkins will be irreparably harmed without injunctive relief.**

37. To continue his medical school career and become licensed as a practicing physician, Jenkins must take and pass all three of the USMLE Step exams. The time for taking the Step 1 exam is now, before beginning the third year of medical school. ULSOM requires that students take the exam before beginning the third year of school. In addition to being required as part of the medical school curriculum, the USMLE Step 1 exam is an important factor for students vying for residency programs at offering institutions. Residency institutions will use Jenkins's score on the USMLE Step 1 Exam to determine whether he is a qualified candidate for their programs.

38. If a student with Jenkins's disabilities is required to take the USMLE without reasonable accommodations, the learning disabilities put him at a distinct disadvantage, as compared to most people, and certainly his peers taking the exam. The playing field for the USMLE will not be level, and Jenkins's performance on the test will not be a full and complete measure of his abilities. The result is most likely a failing score. The consequences of a failing score are that he will fall behind his peers at school.

39. In the event he fails the exam, he will be forced either to take time out from his medical school studies to prepare for and retake the USMLE Step 1 or, alternatively, request a

leave of absence from the Medical School to allow him to successfully complete the USMLE Step 1. Under either scenario, Jenkins would be behind his peers at school, which will raise a red flag for any residency program to which he may apply. Thus, whether Jenkins fails or passes with a lower score, because no accommodation is provided, his future residency and medical training opportunities will be substantially harmed. Ultimately, if he is unable to pass the exam because his disabilities are not accommodated, as required by the ADA, Jenkins would be asked to leave medical school and give up his dream of becoming a medical doctor. Thus, his whole future as a physician may be impacted by this one exam.

40. The significance of the USMLE examination demonstrates why injunctive relief is necessary. There simply is no adequate remedy at law if Jenkins is denied his rights to reasonable accommodation. Sadly, no future judicial remedy could correct or undo the consequences of such events; there is no amount of money or other remedy at law that could compensate him for the loss he could suffer. Moreover, the only real remedy under Title III of the ADA is injunctive relief. There being no adequate remedy at law, Jenkins will suffer irreparable harm if NMBE is allowed to violate Jenkins's ADA rights and withhold the accommodation to which he is entitled. *See Beacon Theatres, Inc. v. Weaver*, 359 U.S. 500, 506-07 (1959); *Millennium Restaurants Group, Inc. v. City of Dallas, Texas*, 181 F.Supp.2d 659, 666-67 (N.D. Tex. 2001).

**C. Jenkins has a learning disability protected by the ADA.**

**1. Definition of disability.**

41. Title III of the ADA prohibits discrimination against persons with disabilities in professional examinations and requires that such examinations be provided in a manner that is accessible to persons with such disabilities. 42 U.S.C. §12189. The Department of Justice ("DOJ") regulations promulgated under Title III of the ADA require that examinations covered

by 42 U.S.C. §12189 be selected and administered in a manner that accurately reflects the individuals aptitude or achievement level rather than reflecting the individual's specific impairment. An entity subject to 42 U.S.C. §12189 discriminates against a disabled individual in violation of the ADA when it fails to make a reasonable accommodation for a known physical or mental impairment. 42 U.S.C. §12112(b)(5)(A). The regulations promulgated under Title III of the ADA also specifically state that changes in the length of time permitted for completing an examination may be an appropriate accommodation. 28 C.F.R. §36.309(b)(2).

42. The NBME administers the USMLE as a nationwide examination for prospective physicians, which must be successfully completed to obtain a medical license in the United States. Accordingly, the NMBE is a covered entity and is required to comply with the provisions of Title III of the ADA. *See Gonzalez v. National Bd. of Medical Examiners*, 225 F.3d 620, 626 (6th Cir. 2000). Because the NBME is subject to the ADA and a request for additional time is an appropriate accommodation, the issue is whether Jenkins has a disability that is protected under the ADA.

43. For purposes of the ADA, a person is disabled if he or she suffers from a "physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42. U.S.C. §12102(2)(A). Although the ADA does not specifically define all of the terms used in the definition of disability, the DOJ, who has authority to implement regulations under Title III of the ADA, defines physical or mental impairment as including "specific learning disabilities." 28 C.F.R. §36.104. These regulations further define major life activity as including "walking, seeing, hearing, speaking, breathing, learning and working." *Id.* §36.104(2). In interpreting the regulations, courts have concluded that the major life activity of learning includes reading and writing. *See Bartlett v. New York State Bd. of Law Examiners*, 226

F.3d 69, 80 (2nd Cir. 1998); *Gonzalez*, 225 F.3d at 626; *Bercovitch v. Baldwin Sch., Inc.,* 133 F.3d, 141, 155 (1st Cir. 1998).

**2. The facts show Jenkins has a disability.**

44. The "substantially limits" standard set forth in the ADA is not specifically defined in the statute. The preamble to the DOJ regulations, however, states "a person is considered an individual with a disability . . . when the individual's important life activities are restricted as to the conditions, manner, or duration under which they can be performed in comparison to most people." 28 C.F.R. Pt. 36, app.b.

45. The evidence presented in this case shows that Jenkins has a mental impairment, specifically a reading disability, that substantially limits his major life activities of learning, reading or writing.

46. The test data, coupled with his history of reading difficulties, establishes that, as compared to most people, Jenkins is restricted as to the conditions, manner and duration under which he can perform the skills related to reading. Accordingly, he has a disability that substantially limits a major life activity and he is entitled to reasonable accommodation in accordance with Title III of the ADA.

47. All of these factors establish one clear picture: Jenkins has learning disabilities that substantially limit his major life activities of learning, reading and writing as compared to most people.

**D. The applicable standard for success on the merits.**

48. The probability of success that Jenkins must show to warrant injunctive relief depends largely on the sufficiency of proof of the other elements required for injunctive relief. "Where the other factors are strong, a showing of some likelihood of success on the merits would

justify temporary injunctive relief." *Productos Carnic*, 621 F.2d at 683. The Tenth Circuit similarly phrased the issue as follows:

> When the first three requirements for a preliminary injunction are satisfied, the moving party's burden of proof on the fourth requirement is lessened 'It will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation.'

*Tri-State Generation*, 805 F.2d at 358 (quoting *Otero Sav. & Loan Ass'n. v. Federal Reserve Bank*, 665 F.2d 275, 278 (10th Cir. 1981)); *see also Cho v. Itco, Inc.*, 782 F.Supp. 1183, 1185 (E.D. Tex., 1991) (applying the "fair ground for litigation" standard where the other factors are strongly shown).

49. Jenkins has strong evidence and authorities that establish every element required for injunctive relief, including showing that he will be irreparably harmed if the injunctive relief is not granted. Accordingly, Jenkins need only show some likelihood of success; he need only raise serious, substantial, difficult and doubtful questions that create a fair ground for litigation. Clearly, Jenkins meets this burden.

50. The evidence outlined above raises more than just a serious, substantial and difficult question and creates more than fair ground for litigation. It shows that Jenkins has learning disabilities that preclude him from performing the tasks of learning and reading in the same manner as compared to most people. Those disabilities substantially limit his major life activities of learning, reading and writing. Under Title III of the ADA, Jenkins is entitled to have those ADA rights acknowledged and protected by the NBME through the reasonable accommodation of additional time. 42 U.S.C. §12189. This showing, along with the other showings that the balance of the hardships tips in his favor significantly, that the injunctive relief furthers the public interest in supporting the rights of the disabled under the ADA, and that he

will suffer irreparable injury if the injunctive relief is not entered, entitles Jenkins to the injunction as sought herein.

**E. An injunction will further the public interest.**

51. The clear legislative mandate behind enactment of the ADA indicates that protection of rights recognized by the ADA is in the public interest. *See* 42 U.S.C. § 12101(b)(1) and (2). Accordingly, the public interest in the ADA is furthered by ordering those who refuse to provide accommodations to disabled individuals to provide reasonable accommodations and comply with the law.

**F. The balance of equities and hardship heavily favors Jenkins.**

52. The potential injury to Jenkins as indicated above could be devastating. As a result of NBME's refusal to provide the reasonable accommodations required by the ADA, Jenkins could loose his opportunity to be a medical doctor. The potential hardship to Jenkins, therefore, is very significant and, as noted above, could result in an irreparable injury to him.

53. The NBME, however, will suffer little if any hardship from an injunction. The NBME simply administers a nationwide test to all prospective medical students. The NBME has provided accommodations to test participants in the past and providing an accommodation to Jenkins in this instance would do nothing to reduce NBME's ability to administer tests as it always has to future students. The bottom line is that an injunction has no significant impact on the NBME or its ongoing operations. Accordingly, the balance of equities and hardships weighs not just heavily in Jenkins's favor, but totally in Jenkins's favor.

## IV.
## Conclusion

54. The Court should act to preserve and protect Jenkins's rights under the ADA and to preserve Jenkins's rights to be accommodated for his disability in accordance with the ADA. Without the injunction, Jenkins will suffer irreparable injury, and the mandate of the ADA, as noted by Congress when it passed the legislation, will be violated. The Court should not allow the NBME to ignore the requirements of the ADA at the expense of a young man's future and livelihood.

55. Jenkins, therefore, respectfully prays that this Court grant his motion for preliminary injunction, require the defendant immediately to cease and desist from violating his ADA rights by refusing to grant him a reasonable accommodation and order the NMBE to comply with the ADA by providing Jenkins with time plus one-half in which to take the USMLE Step 1 examination as presently scheduled on December 18, 2007.

Respectfully submitted,
Vincent E. Nowak, SBOT# 15121550
MULLIN HOARD & BROWN, LLP
500 S. Taylor, Suite 800
P. O. Box 31656
Amarillo, Texas 79120-1656
806.372.5050
806.371.6230 (Fax)

Vincent E. Nowak
Attorney for Plaintiff

**CERTIFICATE OF SERVICE**

The undersigned certifies that a true and correct copy of the foregoing pleading was served on defendant by facsimile transmission as follows:

**Via Facsimile 215.590.9422**
Catherine Farmer
Manager, Disability Services
National Board of Medical Examiners
3570 Market Street
Philadelphia, PA 19104-3190
Amarillo, Texas 79101

Vincent E. Nowak