June 18, 2007

Disability Services
National Board of Medical Examiners
3750 Market Street
Philadelphia, PA 19104-3190
(215) 590-9509



RE: Reapplication cover letter

NBME Disability Services:

I would like to reapply for time and one half accommodations on the USMLE step 1 examination. Now being more familiar with the 1990 Americans with Disabilities Act (ADA) and relative case law I have decided to add new information to my file. Please allow me to clarify previously undressed aspects of my application outlined in your May 18, 2007 letter and also justify why I should be covered under ADA. Please advice me **before** a final decision is made if any of my documentation is incomplete or unclear. I would like to facilitate your decision in anyway I can.

NBME's May 18, 2007 letter denying me accommodations outlines information that my originally submitted documentation failed to address adequately. In paragraph two NBME states, "Learning difficulties of sufficient severity to substantially compromise reading and learning are generally recognized as being developmental in nature. Consequently, it is expected that chronic and pervasive difficulties with reading or learning will emerge during childhood."
- Enclosed is a letter from my preschool and kindergarten teacher Carol Blevins stating that in preschool my disability had emerged and limited the manner in which I could learn effectively.
- Mrs. Blevins documents that I received additional individual instruction to accommodate my learning deficit in reading.

NBME later states in paragraph two, "...no school records, such as grade reports, results of standardized tests, transcripts, etc., were provided to demonstrate that you have experienced longstanding and substantial impairment with respect to reading and learning."
- Enclosed is a 1991 Multidisciplinary Team Report documenting placement into Learning Disability (LD) classes in the third grade.
- Enclosed is a 1991 Individualized Education Program (IEP) Report documenting daily remediation work received as a student in Mrs. Anderson's LD class.
- Enclosed is a written letter from school psychologist, Michael Gontarz, Ed.D., explaining LD placement in Wisconsin is not based on one test or one person's opinion. A panel of my regular education teachers, parents, a clinical psychologist and LD teacher unanimously concluded that I had a *specific learning disability* stating, "Due to academic delays Kirk cannot successfully achieve in regular

RECEIVED
JUL 1 9 2007
Disability Services

education." All M-Team members agreed my learning style was substantially limited enough to justify LD placement.

In paragraph four NBME states, "Professionally recognized *diagnostic standards* for a learning disorder presume the existence of an *underlying central nervous system dysfunction...*"

- I am unaware of central nervous system dysfunction being at all referenced under ADA information as a recognized diagnostic standard necessary to be substantially limited in learning.

Later in paragraph four NBME writes, "overall performances on a range of cognitive and academic achievement tasks across four evaluations from 1991 to 2007 are well within the range of average functioning and do not demonstrate cognitive or academic deficits that substantially impair your ability to read, write, or learn relative to the general population."

- Dr. Gontarz's 1991 evaluation does document academic deficits. He notes, "Teachers have been concerned from year to year about Kirk's academic progress in spelling, written language, and reading."
- This evaluation conducted in January of 1991 should have put my achievement scores at the 3.5 grade level. My 1991 Kaufman Test of Educational Achievement results demonstrate spelling scores at grade levels 2.1 (almost a year and a half behind), reading decoding at 2.6 (almost a full year behind) and overall reading at 3.0 (a half year behind). These scores quantify my academic deficits.
- Dr. Gontarz further wrote in the same 1991 evaluation that I was "½ to ¼ grade year behind in reading, and 1 to 1 ½ grade years delayed in spelling", again documenting academic deficits.
- Dr. Gontarz's evaluation was used to place me in special education LD classes within the framework of the Individuals with Disabilities Education Act as demonstrated by my 1991 IEP that I have submitted. This IEP could only be justified if substantial impairments in learning existed.
- It is also important to note that though a decreased reading speed was observed **no fluency scores were scaled, nor required, in 1991, 1999 or 2003**.

In paragraph five NBME points out Dr. Gontarz's observation, "Although reading decoding is near the discrepancy level, Kirk's comprehension is not. Therefore it is questioned if reading should be considered an EEN." The NBME evaluator used this statement to support her belief that, "thus it appears that your reading ability as early as third grade was in the average range compared to same age peers."

- Gontarz writes, "We should continue regular education for reading with close monitoring by the learning specialist. If he is no longer able to compensate in reading as he has been doing or if regular education can no longer meet his needs, then we can include reading on his IEP." One can see Dr. Gontarz's comments were made not to say a deficit did not exist but rather that I needed to be closely monitored in case my compensatory skills could no longer mask my deficit.
- Enclosed is a letter from learning specialist, then my LD teacher, Mrs. Lori TeeGarden-Anderson stating that the decision was made to give me reading

ECEIVED
JUL 19 2007
isability Services

support. Reading instruction focusing on phonics components to improve reading fluency was implemented. Mrs. TeeGarden writes, "Kirk was only able to participate within the mainstream of regular education reading classes because of the supportive-instruction that he was receiving from his placement in the Learning Disabilities classroom." One can see my compensatory skills did not continue to mask my deficit.

Later in that paragraph NBME pointed out that no DSM diagnosis was assigned during the elementary school evaluation.
- The 1991 evaluation was not drafted to specifically address ADA criteria. It was completed under the regulations outlined by IDEA.
- At this time scaled fluency scores were not necessary.

In paragraph six NBME references Dr. Holmes 1999 statement, "the WIAT showed all achievement scores to be *technically* in the average range but all subtest scores except for Mathematics Reasoning are significantly below expectation."
- Dr. Holmes used a discrepancy among cognitive ability and academic achievement to support a learning disability, as this was sufficient criteria for ACT to allow accommodations. This evaluation documented clearly this discrepancy and it was in this light that that evaluation was presented.
- Meeting ACT standards does not rule out that a substantial limitation was not present. In fact Dr. Holmes ends the same paragraph from which the NBME's evaluator referenced the above statement by writing, "Several of the WIAT scores are below the level often considered to make the LD range."

NBME later in paragraph six points out again that Dr. Holmes in 1999 did not assign a DSM diagnosis.
- ACT did not require this diagnosis.
- Enclosed is a letter from John Lacy, PhD, HSPP stating that no scaled fluency measurements were administered until 2007.
- Dr. Holmes in 1999 does note the existence of a decreased reading rate recommending, "...that he (Kirk) make use of various strategies to improve his reading: slow down the speed, *seek extra time for tests involving significant elements of reading...*" One can see my fluency deficit was observed and referenced but it was not accurately scaled until my most recent evaluation.

In paragraph seven NBME again points out that a discrepancy model was used to justify accommodations on the MCAT. The evaluator writes, "It appears that your evaluator (Holmes) bases his 1999 comments and 2003 diagnosis upon discrepancies among your performances on various measures of cognitive ability and academic achievement."
- This was the criteria outlined by MCAT and it was in this light that the evaluation was constructed. Again this does not rule out a substantial limitation in learning.
- Dr. Holmes in his 2003 evaluation on page three of his intake note under symptoms categorizes my slow reading speed as being "severe."
- On page two of his progress note Holmes writes, "His (Kirk's) reading comprehension score was in the 4th quartile while his reading speed score was in the 1st quartile. This is an atypical combination such that his **reading speed is**

- **far below average** while his comprehension is above average. Such a pattern matches his history though." One can see that a fluency deficit was documented.
- Holmes later states, "Any task requiring reading with speed expectations produced his lowest scores. The strength still of his other language functions is encouraging but **may also result in others not readily recognizing his LD style.**" A fluency deficit was observed but it was not accurately scaled until later.
- Dr. Lacy's enclosed letter addresses my fluency deficit more thoroughly.

In paragraph eight NBME writes, "Dr. Lacy appears to base his diagnostic conclusion upon an ability –achievement discrepancy formula." The evaluator later writes, "Using an extreme 98th percentile IQ as the standard by which all other scores should be measured incorrectly presumes that all abilities should be evenly well developed."

- The NBME evaluator failed to make any reference to my current reading fluency score (14th percentile *when compared to the general population*) that is a full standard deviation below average.

Sec.36.309bi of the Americans with Disabilities Act states:

> The examination is selected and administered so as to best ensure that, when the examination is administered to an individual with a disability that impairs sensory, manual, or speaking skills, the examination results accurately reflect the individuals aptitude or achievement level of **whatever factors the examination purports to measure**, rather than reflecting the individual's impaired sensory, manual or speaking skills.

In seeking precedent the 2003 James Avery Rush, IV (Plaintiff) v National Board of Medical Examiners (Defendant) states:

> The United States Medical Licensing Examination, Step 1 (USMLE Step 1), is a timed multiple-choice examination **designed to test a person's mastery of the basic science underlying medicine and one's ability to utilize that knowledge.** The Step I examination is not graded on a curve; it is a mastery test. Because it is a mastery test, in theory 100% of the persons taking the Step 1 examination could pass, or fail, each time the test is offered. With a mastery test, the test taker either knows the material and passes the exam, or he does not know the tested-for material and fails the exam. Time constraints for most individuals who take this test are not of major consequence because the majority of medical students possess the reading and processing efficiency needed to work through the test and the set of possible answers within the time constraints that are allowed. **This is not true however for individuals with reading disabilities.**

One can see that the USMLE Step 1 is not a reading comprehension test. The exam's purpose is to evaluate a student's knowledge of medical material. Extra time to read will not magically put more knowledge in my head. Time accommodations will only allow me to demonstrate whether I possess adequate medical knowledge or not. The 2003 James Avery Rush, IV v NBME also states:

_CEIVED

JUL 1 9 2007

isability Service

> The USMLE Step I examination involves and requires extensive reading, and scoring well and/or passage of the exam requires extensive subject-matter knowledge. Plaintiff has shown a sufficient causal connection between his reading impairment and his failures to score well, **or as well as he might**, on time-limited examinations requiring extensive reading. Plaintiff has shown that if he is accommodated he will be effectively tested not on his disability but rather on his subject-matter knowledge. Plaintiff has shown his reading impairment seriously decreases the rate at which he reads with comprehension. Plaintiff will suffer irreparable injury if the requested injunction is denied.

One can see my USMLE scores under normal time constraints would most certainly reflect the extent of my impairment due to my 14th percentile reading fluency score not allowing accurate demonstration of my medical knowledge aptitude. The above ruling also applies to me as Mr. Rush's deficit was due to "low reading and efficiency caused by a very low or very weak reading processing and decision speed." My documentation when taken as a whole presents a similar deficit.
- Enclosed is a personal statement describing how a decreased reading fluency has substantially limited my ability to learn throughout my educational development.
- Also enclosed is Dr. Lacy's letter validating my fluency deficit.

Finally in paragraph three NBME writes, "Your overall performances (composite) over three administrations of the ACT in 1998-1999 range from the 56th to 82nd percentile rank when compared to grade peers."
- If one looks more closely at my national (unaccommodated) ACT test results and compares them to my special (accommodated) ACT, one will find a scenario more consistent with my history. It is important to note that my unaccommodated 10/99 English and Mathematics scores vary only slightly from my accommodated 12/99 scores (English: 92nd-94th and Math: 85th-92nd). This is because these exams are far less dependent on timed reading.
- My Science Reasoning scores and most importantly my Reading scores vary significantly from the 10/99 to 12/99 exam (Science 65th-95th and Reading 64th to 99th). The above discrepancy is **not** an example of a discrepancy model based on *possible* cognitive ability compared to academic achievement, which as stated by NBME cannot be used as the sole basis for a diagnosis or rationale for accommodation. The above is a startling discrepancy between academic achievement and *demonstrated* academic achievement with accommodation.
- This demonstrates, like James Avery Rush IV, "that if he is accommodated he will be effectively tested not on his disability but rather on his subject-matter knowledge," and that, "sufficient causal connection between his reading impairment and his failures to score well, **or as well as he might**, on time-limited examinations requiring extensive reading."
- Nothing in my documentation is presented that would lead one to the conclusion that if I had been granted accommodations on the PSAT as well that a significant achievement-to-achievement discrepancy would have presented.

RECEIVED
JUL 1 9 2007
Disability Services

The 1990 Americans with Disabilities Act (ADA) provides comprehensive civil rights protection for "individuals with disabilities." ADA defines an individual with a disability as a person who:

> Has a physical or mental impairment that substantially limits one of more major life activities, or
> Has a record of such an impairment, or
> Is regarded as having such an impairment.

It defines "physical or mental impairment" as including *specific learning disabilities* and also defines "major life activities" as including *learning*. My *Learning Disability* is best defined currently as a reading fluency deficit that substantially limits my ability to learn when compared to the general population. My submitted documentation justifies that I have a long standing letter decoding, written language, fluency reading and spelling deficit that has for my entire academic career significantly limited my ability to learn. To deny this is to go against numerous personal accounts and evaluations completed by my teachers, LD reading specialist, three different psychoeducational evaluators and academic records that clearly demonstrated achievement discrepancies on timed standardized test scores. Also outlined above is the purpose of the USMLE Step 1, which is to evaluate medical based science knowledge. Time accommodations should have no effect on the amount of medical knowledge I display on the exam. As stated above, "With a mastery test, the test taker either knows the material and passes the exam, or he does not know the tested-for material and fails the exam."

Again, please advice me **before** a final decision is made if any of my documentation is incomplete or unclear.

Thank you,

*[signature]*

Kirk D. Jenkins
3rd Year Medical Student
University of Louisville School of Medicine

Ringle, WI 54471   REDACTED

Encl.
  Personal statement
  M-Team Report
  Individual Educational Program Report
  Letter from John M. Lacy, PhD, HSPP
  Letter from Michael Gontarz, MSEd, NCSP
  Letter from Lori TeeGarden
  Letter from Carol Blevins

RECEIVED
JUL 1 9 2007
Disability Services