IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

KIRK D. JENKINS, )
                    Plaintiff )
  )
v. )    Case No. 3:07CV-698-H
  )
NATIONAL BOARD OF )    Chief Judge John G. Heyburn, II
MEDICAL EXAMINERS )
                Defendant )

**DEFENDANT'S HEARING BRIEF IN OPPOSITON TO
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Comes the Defendant, National Board of Medical Examiners ("NBME"), by and through

counsel, and for its Hearing Brief in Opposition to Plaintiff's Motion for Preliminary Injunction

hereby states as follows:

## I.      STATEMENT OF FACTS

NBME is a private non-profit corporation which, together with the Federation of State

Medical Boards of the United States, Inc. ("FSMB"), another non-profit corporation, has

established the United States Medical Licensing Examination$^{TM}$ ("USMLE"). The USMLE is an

examination designed to assess a prospective physician's ability to apply knowledge, concepts,

and principles, and to demonstrate fundamental patient-centered skills, that are important in

health and disease and that constitute the basis of safe and effective patient care. There are three

major segments to the USMLE, known as "Steps." Step 1 assesses whether an applicant can

understand and apply important concepts of the sciences basic to the practice of medicine, with

special emphasis on the principles and mechanisms underlying health, disease, and modes of

1

therapy.  Step 2, which consists of separate clinical knowledge ("CK") and clinical skills ("CS") components, assesses whether an applicant can apply medical knowledge, skills, and understanding of clinical science essential for the provision of patient care under supervision and includes emphasis on health promotion and disease prevention.  Step 3 assesses whether an applicant can apply medical knowledge and understanding of biomedical and clinical science essential for the unsupervised practice of medicine, with emphasis on patient management in ambulatory settings.

Eligible registrants select a three-month period during which they wish to take the examination.  Upon completion of the registration process and a determination of eligibility, NBME sends to the registrant a Scheduling Permit, which specifies the three-month eligibility period during which the registrant must complete the examination.  It is then the registrant's responsibility to contact his or her preferred Prometric® Testing Center to schedule a test date during that three-month period.  If a registrant is unable to take the Step 1 examination within his or her eligibility period, extensions are available for a fee of $50 to take the test during the contiguous three-month eligibility period.  The Step 1 examination can be taken at a time and place of the examinee's choice, five or six days a week, fifty weeks a year.

## A.    JENKINS' PROCEDURAL HISTORY

The Plaintiff, Kirk D. Jenkins ("Jenkins"), is a medical student at the University of Louisville School of Medicine ("ULSOM") who has completed his second year of instruction. PL DP, p. 5.  On November 26, 2006 Jenkins applied to take the USMLE Step 1 and requested May-June-July, 2007 eligibility.  Affidavit of Susan Deitch, para. 9, attached hereto as Ex. 1 (hereafter referred to as Deitch Aff.). On December 5, 2006, NBME received from Jenkins a

request for the accommodation of additional testing time on Step 1.  Affidavit of Catherine Farmer, para. 4, attached hereto as Ex. 2 (hereafter referred to as Farmer Aff.).  Following review of the documentation submitted, NBME informed Jenkins via letter dated December 7, 2006 that the documentation he had provided was insufficient and requesting additional documentation. *Id.* at para. 4.  On February 26, 2007, the NBME received additional documentation and an updated personal statement from Jenkins.  On March 2, 2007 Jenkins communicated to NBME via voice mail that that he intended to submit further documentation; however, on April 5, 2007 Jenkins again contacted NBME and stated that he would not be submitting any additional documentation,  requesting that NBME proceed with its review.  *Id.* at para. 7.  NBME forwarded Jenkins' request and the supporting documentation submitted to its outside consultant, Richard Sparks, Ed.D, for his review. On April 30, 2007 Dr. Sparks sent the NBME his recommendation that Jenkins' request for accommodation should be denied because the documentation Jenkins had provided did not show that Jenkins is unable to learn and achieve at the level of the average person in the population. *Id.* at para. 8. Via letter dated May 18, 2007, NBME informed Jenkins that the information he submitted failed to establish that he was substantially limited in a major life activity and therefore his request is denied.  *Id.* at para. 9.  On May 21, 2007, NBME staff extended Jenkins' eligibility period to June-July-August to ensure his access to the full 90-day testing period.  Deitch Aff., para. 9.

On July 6, 2007, Jenkins requested to extend his eligibility to September-October-November, 2007.  By letter dated June 18, 2007 and received by NBME on July 19, 2007 Jenkins requested reconsideration, providing additional documentation in support of his request for accommodation.  Farmer Aff., para. 11 and Deitch Aff., para. 9.  NBME forwarded Jenkins'

subsequent request and supporting documentation for review by its outside consultant, Joseph Bernier, Ph.D., who recommended on August 6, 2007 that Jenkins' request should be denied because, despite Jenkins' reported reading fluency problems, the documentation provided by Jenkins demonstrated a pattern of competence rather than severely limited or disabled functioning as required under the ADA.  Farmer Aff., para. 12 and 13.  NBME notified Jenkins of its determination by letter dated August 29, 2007.  *Id.* at para. 15.

On October 27, 2007, Jenkins scheduled to take Step 1 on November 29, 2007 in Amarillo, Texas.  On November 7, 2007, the University of Louisville School of Medicine waived the requirement that Jenkins pass the Step 1 prior to progressing to his clinical clerkships and permitted him to progress regardless of his score on Step 1, provided that he ultimately passed both Step 1 and Step 2 to qualify for graduation.  Exhibit 2 to PL DP, attached hereto as Ex. 3; PL DP pp. 9-10. On November 9, 2007 Jenkins cancelled his November 29, 2007 appointment and informed NBME that he wished to terminate his current eligibility period of September-October-November so that he could reapply and test in December. The same day Jenkins re-registered for the Step 1 examination, requesting an eligibility period of December 2007 through February 2008.

On November 16, 2007 Jenkins scheduled to take Step 1 on December 18, 2007 in Amarillo, Texas. Deitch Aff., para. 9 and 10.  On December 5, 2007, Jenkins commenced this action in the Amarillo U.S. District Court, which subsequently transferred the matter to this Court.  On December 13, 2007, he rescheduled his December 18 test date for February 12, 2008. Jenkins has now rescheduled to take Step 1 on February 21, 2008, in Louisville, Kentucky.

**B.     JENKINS' ACADEMIC AND TESTING HISTORY**

The documentation submitted by Jenkins to NBME and documentation received in discovery as well as Jenkins' own testimony establish the following:

• Jenkins experienced some difficulty with beginning reading skills in preschool, for which his teacher provided additional instruction.  *See* Exhibit 1 to Complaint, attached hereto as Ex. 4.

• In third grade, Jenkins was evaluated by Michael Gontarz, MSEd, NCSP.  In his January 31, 1991 evaluation report, Mr. Gontarz reported that Jenkins performed within the average range on standardized tests of reading skills, and his teachers reported that Jenkins was functioning well in the middle reading group of regular education.  *See* Exhibit 3 to Complaint, attached hereto as Ex. 5.

•   As a result of Mr. Gontarz's evaluation, Jenkins was provided with an Individualized Education Program (IEP) to improve his ability to spell and write in third grade.  *Id.*

• Jenkins was not re-evaluated by the school psychologist and did not receive another IEP after the third grade.  PL DP, p. 33.

• In the fifth grade, he achieved average or higher scores on all subtests of the Comprehensive Tests of Basic Skills (CTBS), including a Total Reading performance better than 89% of his grade peers.  *See* Plaintiff's middle-high school transcripts, Exhibit 4 to PL DP, attached hereto as Ex. 6.

• Jenkins performed exceptionally well in junior high school, earning grades of A+, A, or A- in all but one class over two years.  *Id.*

• Jenkins also performed exceptionally well in high school, again earning grades of A+, A, or A- in all but one class over four years.  *Id.*

• Jenkins' high school coursework included Honors History, Honors Biology and Advanced Placement History, Advanced Placement Literature, and Advanced Placement Writing.  *Id.; see also* PL DP, p. 46-47.

• Jenkins took four (4) years of Spanish in high school, earning a grade of A or A- each year.  *Id.*; *see also* PL DP, p. 44-45.

•   Jenkins took the PSAT twice without any accommodation and achieved average to above average scores.  *Id.*

• Jenkins took the ACT without accommodation three (3) times, achieving an average or above average score each time.  *Id.*; *see also* Plaintiff's ACT Assessment Reports, Exhibit 5 to PL DP,

attached hereto as Ex. 7; PL DP, p. 55.

• Jenkins graduated 13th in his high school class of 346 with a 3.937/4.0 GPA.  Ex. 6; PL DP, p. 53.

• Jenkins sought and was granted accommodations of extra time in test taking in college. Jenkins used this accommodation on all tests, including those where reading was not a significant component such as math.  PL DP, p. 79.

• Jenkins graduated from college with honors with a Bachelor of Science in Zoology and a GPA of 3.518.  *See* Plaintiff's University of Wisconsin-Madison Transcript, Exhibit 6 to PL DP, attached hereto as Ex. 8.

• Evaluations conducted in 1999 and in 2003 by David R. Holmes, Ph.D. showed that Jenkins' performance on a range of cognitive and academic achievement tasks were all well within the average or above average range, with the sole exception of his 1999 Wechsler Individual Achievement Test (WIAT) Spelling subtest score.  *See* Exhibit 7 to Complaint, attached hereto as Ex. 9.

• On a 2007 evaluation by John M. Lacy, Ph.D., HSPP, Jenkins' performance on a range of cognitive and academic achievement tasks were all well within the average or above average range, with the sole exception of his Reading Fluency subtest score.  *See* Exhibit 12 to Complaint, attached hereto as Ex. 10 .

## II.     ARGUMENT

## A.     JENKINS FAILS TO MEET THE REQUIRED ELEMENTS FOR INJUNCTIVE RELIEF

It is well established that district courts must assess four factors in analyzing whether to grant a preliminary injunction:

- • Whether the plaintiff has a strong likelihood of succeeding on the merits;
- • Whether the plaintiff will suffer irreparable injury absent the injunction;
- • Whether issuing the injunction will cause substantial harm to others; and
- • Whether the public interest will be furthered by the issuance of the injunction.

*Gonzales v. National Board of Medical Examiners*, 225 F.3d 620, 625 (6th Cir. 2000) *rehearing en banc denied* (2000) (citations omitted).  "Although no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal."  *Id.* (citations omitted).

The facts here clearly establish that Jenkins will not suffer irreparable injury absent an injunction. Jenkins does not suffer from a disability within the protection of the Americans with Disabilities Act (ADA) which would entitle him to accommodation on the USMLE Step 1 and, therefore, cannot establish a strong likelihood of success on the merits of his claim. This failure alone is fatal to his claim for emergency injunctive relief. Moreover, as discussed below, Jenkins cannot establish that he will suffer irreparable harm absent an injunction. Issuing an injunction in this matter will, however, result in harm to other examinees taking Step 1. Finally, requiring NBME to extend an accommodation to Jenkins, who cannot establish that he is disabled, would call into question the integrity of the USMLE testing process, a process relied upon by state medical licensing authorities in assessing the qualifications of applicants for licensing.

## B.   JENKINS IS NOT DISABLED UNDER THE AMERICANS WITH DISABILITIES ACT.

The ADA prohibits discrimination against disabled individuals in public accommodations, including professional exams such as USMLE, Step 1. 42 U.S.C.A. §12189. The NBME requires individuals seeking an accommodation to submit documentation establishing that the individual is, in fact, disabled within the meaning of the ADA. Deitch Aff, para. 4; Farmer Aff., para. 2. A person is disabled within the meaning of the ADA if that individual suffers from a "physical or mental impairment that **substantially limits** one or more of the major life activities of such individual." 42 U.S.A. §102(2)(a)(emphasis added). The Department of Justice is charged with promulgating regulations pursuant to Title III of the ADA and defines "major life activities" to include walking, seeing, hearing, speaking, learning, and working. 28 CFR §36.104(2). Courts have often included reading and writing as major life activities under the ADA. *Gonzales* 225 F.3d at pg. 626. A "physical or mental impairment" is

7

defined as including "specific learning disabilities."  28 CFR §36.104 (1999).

The Department of Justice regulations state that an individual is substantially limited "when the individual's important life activities are restricted as to the condition, manner, or duration under which they can be performed **in comparison to most people**."  28 CFR pt. 36, App. B (emphasis added).

**1.      Jenkins is not Substantially Impaired as Compared to the Average Person.**

Jenkins asserts that he suffers from a Reading Disorder (315.00), Disorder of Written Expression (315.2) and Learning Disorder NOS (Not Otherwise Specified) (315.9) pursuant to the American Psychiatric Association's <u>Diagnostic and Statistical Manual of Mental Disorders</u> (4th ed. 1994) ("DSM-IV").  The results of psychological tests, like many other tests, exhibit a "normal distribution," which can be mapped on a "bell curve."  The universally accepted view in psychology and other scientific fields defines "average" as the middle 68 percent of the bell curve, i.e., between the 16th and 84th percentiles.  Using a standard bell curve methodology, scores that are between the 16th and 84th percentile fall within one standard deviation of the mean and are within the average range.  In other words, the 68% of the population are within the average range, or "normal," for the purpose of analyzing diagnostic tests of ability and achievement in the field of psychology. <u>See</u>, <u>e.g.</u>, Anastasi & Urbina, <u>Psychological Testing, 7th</u> <u>edition</u>, 1997; Petrie & Sabin, <u>Medical Statistics at a Glance</u>, 2000; Stein & Cutler, <u>Clinical</u> <u>Research in Allied Health and Special Education</u>, 3rd edition, 1996; Hinkle, Wiersman & Jurs, <u>Applied Statistics for Behavioral Sciences, 5th edition</u>, 2003.  Indeed, this point is so widely accepted that it is even expressed in <u>Statistics for Dummies</u>.  <u>See</u> Rumsey, <u>Statistics for</u> <u>Dummies</u>, 2003 ("As long as the distribution has a mount in the middle – and the normal

distribution certainly fits that criterion – you can make some general statements about where most of the values will be. . . . About 68% of the values will lie within one standard deviation of the mean. . . .").

Jenkins has not established that he suffers from any impairment, substantial or otherwise. Jenkins has been subjected to psychological tests by a number of clinicians and has consistently scored within the average or above average range.  There is no evidence demonstrating that Jenkins does not learn in a manner comparable to an average person, as shown by his educational accomplishments recited above.  When Jenkins' test results are compared to the appropriate benchmark, the conclusion is clear; Jenkins falls within the average range of performance.

The mere fact that a limited number of test scores are below the mean does not indicate that Jenkins' ability to learn is not within the normal range, i.e. 16-84%.  *See Calef v. Gillette Co.*, 322 F.3d 75, 84 (1st Cir. 2003) (finding that plaintiff was not substantially limited in learning in general because his test scores were within the normal range – even though he had specific subtest scores "significantly below the mean").  In this case, Jenkins' test scores fall, overwhelmingly, within the average or normal range.  Thus, he is not substantially limited as compared to most people, and is not disabled under the ADA.

Even if Jenkins were able to establish that he has an impairment, he is still not disabled for purposes of the ADA, as Jenkins has failed to establish that his alleged impairment substantially limits him in a major life activity as compared to most people.

**2.     Jenkins' Impairment, if Any, Does Not Substantially Limit him in a Major Life Activity.**

The United States Supreme Court, in *Toyota Motor Manufacturing Kentucky, Inc. v. Williams,* 534 U.S. 184, 122 S.Ct. 681 (2002), addressed what a plaintiff must demonstrate in

order to establish a disability under the ADA.  The Court held it was insufficient for individuals attempting to prove disability status "to merely submit evidence of a medical diagnosis of an impairment"; instead it is necessary "to prove a disability by offering evidence that the extent of the limitation [caused by their impairment] in terms of their own experience is substantial."  *Id.* at 198.

The Sixth Circuit case of *Gonzales v. National Board of Medical Examiners,* 225 F.3d 620, 625 (6th Cir. 2000) *rehearing en banc denied* (2000), is controlling here.  As with Jenkins, Gonzales sought preliminary injunctive relief under the ADA to give him extended time to take USMLE Step 1 due to an asserted learning disability. Like Jenkins, Gonzales qualified for advanced placement classes in high school, graduated with an exceptional grade point average, received no formal accommodations for learning disabilities during high school, and achieved an average score on his college entrance exams when taken without accommodations.[1]  *Gonzales* at p. 630. While in college, Gonzales was evaluated and diagnosed as having a learning disability and was provided with accommodations in his last two years of study.  In medical school, accommodations were also provided to Gonzales based on the same psychological report and diagnosis.  In support of his request to the NBME for accommodation on Step 1, Gonzales was evaluated by another psychologist who determined that Gonzales met the criteria for a Reading Disorder (315.00) and for a Disorder of Written Expression (3515.2) under the DSM-IV.  As with Jenkins, Gonzales' scores were squarely in the average to superior range on over twelve tests that had been administered to him; he scored significantly below average in only one.

The Sixth Circuit noted the case turned on the interpretation of the phrase "substantially limits" and held that "substantially limits" is defined in terms of the general population.  *Id.* at

---

[1]        Gonzales took the SAT; Jenkins took the ACT.

626.   The Sixth Circuit found that the evidence supported the district court's finding that Gonzales' performance fell within the average to superior range when compared to most people and, therefore, he failed to "demonstrate that he suffered from 'an ADA-defined disability' that substantially affects a major life activity".  *Id.* at 627.  As the trial court noted, average or even slightly below average performance is not a disability under the ADA.  *Gonzales,* 60 F.Supp.2d at 708 (citations omitted).

The ADA "is not designed 'to allow individuals to advance to professional positions through a back door.  Rather, it is aimed at rebuilding the threshold of a profession's front door so that capable people with unrelated disabilities are not barred by that threshold alone from entering the front door."  *Price v. National Bd. of Med. Exam'rs*, 966 F.Supp. 419, 421-22 (S.D. W. Va. 1997) (citation omitted).  The *Price* court offered an appropriate example:

> Take, for example, two hypothetical students.  Student A has average intellectual capacity and an impairment (dyslexia) that limits his ability to learn so that he can only learn as well as ten percent of the population.  His ability to learn is substantially impaired because it is limited in comparison to most people.  Therefore, Student A has a disability for purposes of the ADA.  By contrast, Student B has superior intellectual capability, but her impairment (dyslexia) limits her ability so that she can learn as well as the average person.  Her dyslexia qualifies as an impairment.  However, Student B's impairment does not substantially limit the major life function of learning, because it does not restrict her ability to learn as compared with most people.  Therefore Student B is not a person with a disability for purposes of the ADA.

*Price.* 966 F.Supp. at 427.  Similarly, Jenkins may have above average to superior intellectual ability, but his ability to learn, as clearly evidenced by his academic history, is as good, or better than that of the average person.

Moreover, the opinion of an expert that a plaintiff has a learning disability or a diagnosis under the DSM-IV does not necessarily equate to an impairment or disability under the ADA.

11

The DSM-IV admonishes that due to the "imperfect fit between the questions of ultimate concern to the law and the information contained in a clinical diagnosis" a clinical diagnosis of a DSM-IV mental disorder is not sufficient to establish the existence of a disorder for legal purposes.  DSM-IV, "Use of DSM-IV in Forensic Settings," p. xxxiii, Ex. 11 hereto.

> In determining whether an individual meets a specified legal standard . . . additional information is usually required beyond that contained in the DSM-IV diagnosis. . . . It is precisely because impairments, abilities, and disabilities vary widely within each diagnostic category that assignment of a particular diagnosis does not imply a specific level of impairment or disability.

*Id.*

In reaching his opinion that Jenkins has a reading and learning disorder, Jenkins' expert, John M. Lacy, Ph.D., HSPP, failed to take into account such additional information.  While acknowledging that it is important for purposes of diagnosis to know how Jenkins did in high school, Lacy testified that he conducted his evaluation without seeing Jenkins' high school transcript, and relied only upon previous reports that commented on them.  Lacy DP, pp. 53-54.  Thus, Lacy was unaware, for instance, that Jenkins finished 13th in a class of 346, or that he had taken, and performed exceptionally well in, a number of honors and advanced placement classes which had heavy reading requirements.  *Id.* at p. 54. Lacy and others who have evaluated Jenkins also routinely overlook his average or better diagnostic test scores and his history of average or better unaccommodated achievement on CTBS, the PSAT and the ACT and outstanding academic accomplishments.  Jenkins performed exceptionally well in high school and college classes that demanded significant reading.   Lacy testified that the PSAT and ACT are intended to reflect performance "in a normative sense, in comparison to the general population taking into account a person's grade." *Id.* at pp. 64-65.   Lacy acknowledged that Jenkins performed

"squarely in the average range in 1996, and right at the upper boundary of the average range in 1998" on the PSAT.  *Id.* at p.66.  He further acknowledged that Jenkins scored squarely in the average range on the first two unaccommodated ACT tests, and slightly in the above average range on the third unaccommodated ACT. *Id.*[2]  Jenkins' achievements are simply inconsistent with the assigned diagnoses.   While Jenkins' experts assert that he cannot succeed on unaccommodated, standardized exams, he did exactly that at least six times with the CTBS, PSAT and ACT, achieving average or better scores.

Although Jenkins attempts to characterize his affected major life activity as reading, it is clear from the record that Jenkins actually claims that his alleged impairment only affects his taking of certain standardized tests and then only when the tests are strictly timed.  Inability to pass timed tests on medical topics does not qualify as a major life activity for <u>most people</u>, and therefore is not covered by the ADA.  *See, e.g., McGuinness v. University of N.M. Sch. Of Med.*, 170 F.3d 974, 978-79 (10th Cir. 1998); *see also, Singh v. George Washington University School of Medicine and Health,* 508 F.3d 1097, 1104 (D.C. Cir. 1007) (Holding that "test-taking itself is not a major life activity" in accordance with the standards expressed by the U.S. Supreme Court in *Toyota Motor,* 534 U.S. at 197-198.).  Since Dr. Lacy's opinion that Jenkins is entitled to accommodation under the ADA is based on the false assumption that "attending medical school" and "test taking" are major life activities, his opinion has no probative value in this case.  Lacy DP, p. 108.

---

[2]     Jenkins testified that the first time he took the ACT "I didn't prepare for it, didn't do anything, just walked in and wrote the exam."  PL DP p. 60.  Prior to taking the ACT for the third time, unaccommodated, Jenkins had taken some ACT prep courses and put in "a week and a half" of study. *Id.* at p. 61.  With test preparation Jenkins improved his score by twenty-six percent (26%). *See* Ex. 6.

13

C.     **MERE DISPARITY BETWEEN PERFORMANCE AND ABILITY DOES NOT EQUAL DISABILITY UNDER THE ADA.**

Jenkins asserts that his alleged reading and learning disorder prevents him from performing up to his inherent capacity (the "discrepancy theory") and thereby qualifies as a disability under the ADA.  This argument, too, is without merit.

The recent case of *Singh v. George Washington University School of Medicine and Health*, 508 F.3d 1097 (D.C. Cir. 2007) is illustrative.  Singh was diagnosed with dyslexia and a processing speed disorder and argued that she was substantially limited in the major life activity of learning as compared "with a population of similar age and education level" or alternatively, "with what she could achieve if she was either free of her learning disabilities or was provided reasonable accommodations."  *Id.* at 1100.  The university argued that the appropriate standard in assessing whether or not Singh's limitation was substantial was comparison to the average person in the general population. Relying on the U.S. Supreme Court's opinion in *Toyota Motor, supra,* the court determined that the appropriate comparison was to the general population "rather than to persons of elite ability or unusual experience. A restriction qualifies as 'severe' only if it limits the impaired individual to the context of what 'most people' do in their 'daily lives.'"  *Id.*

The court further relied upon the U.S. Supreme Court's ruling in *Sutton v. United Airlines, Inc.,* 527 U.S. 471 (1999) to hold that:

> It is intuitively appealing to measure limitation by comparing the plaintiff's condition impaired with her own condition, unimpaired.  There is something poignant, in some cases even tragic, in the plight of a person cut off from exceptional achievement by some accident of birth or history.  But the ADA is not addressed to that plight.  Rather, it is designed to enable the disabled, as a group, to participate in mainstream society. . . . The ADA therefore seeks to offer the disabled "equality of opportunity, full participation, independent living, and

14

economic self-sufficiency."   A plaintiff who, despite an impairment, can participate in all major life activities at the level of the average person and the general population neither is denied "independent living and economic self-sufficiency," nor burdens society with "dependency and non-productivity," nor falls within the kind of "isolated and segregated" minority described by the statute's text.   The ADA promotes equal opportunity for the disabled, but only after *Toyota Motors*' "demanding standard" is met.

*Id.* at 1101-1102 (citations omitted).

The *Singh* court further found that "test taking itself is not a major life activity" referencing the holding of the Supreme Court in *Toyota Motor* which defined "major life activities" as "those activities that are of central importance to daily life." *Id.* at p. 1104 (citation omitted).   The court noted that Singh's test taking difficulties could play a role in the "individualized assessment" that must be made, "but only if the limitation is substantial from the prospective of the major life activity as a whole." *Id.* at 1104-1105.

A case about accommodation on the Law School Admission Test (LSAT), *Love v. Law School Admission Council, Inc.*, 513 F.Supp. 2d 206 (E.D. PA 2007), also involves a plaintiff similar to Jenkins.   Love experienced some difficulty early in elementary school, but his performance overall was good and he scored well on standardized reading assessment tests. "Informal accommodations" were provided in high school, but as with Jenkins, these were generally available to all students.   Love's scores on the SAT and the ACT exams, taken without any accommodations, were within the average range. Love did not seek formal accommodations in college, but his professors provided him with informal accommodations when needed.   *Id.* at pp. 212-215.

15

Love took the LSAT, earning a score that fell in the national average range.  However, Love alleged that his unaccommodated score was "not a reflection of his true potential because he has difficulty reading and guessed on over 50% of the questions on the exam."  *Id.* at 217. Love's expert identified Love as having a processing speed disorder, or DSM-IV learning disorder NOS (not otherwise specified).  *Id.* at 219.  As with Jenkins, Love's experts pointed to the discrepancy between his performance on tests of aptitude and achievement. *Id.*  However, the *Love* court held that:

> Clinical significance and legal significance are two different things.  Test scores that are clinically significant are not necessarily legally significant. . . . Although plaintiff's processing speed is clinically significant, the problem has not manifested itself in his standardized testing as evidenced by his average performance on the IOWA, the SAT and the ACT, all of which are timed.
>
> .     .     .     .     .
>
> The fact that plaintiff is clinically diagnosed as having a learning impairment does not automatically mean that he is entitled to an accommodation under the ADA. An impairment and a disability are two different things.  In order to receive an accommodation under the Act, plaintiff's impairment must substantially limit his ability to read so as to significantly restrict the condition, manner and duration under which plaintiff can perform the task of reading and processing information as compared to the condition, manner, or duration under which the average person in the general population can perform the same activity.

*Id.* at 222-26.  While acknowledging that Love suffered from a learning impairment, the court cited to *Gonzales* and *Price* in finding that Love was not disabled under the ADA.  *Id.* p. 228. *See also, Baer v. National Board of Medical Examiners,* 392 F.Supp.2d 42, 46 (holding that it is possible for a person to be diagnosed by a psychologist as having a learning disability and yet not have a disability within the meaning of the ADA).

Jenkins' alleged impairment has not substantially limited his ability to read and process information as compared with the average person in the general population.  Jenkins' complaint itself recognizes that the proper comparison is to the average person in the general population,

although it misrepresents Jenkins' performance using this standard.  *See* Complaint para. 46 and 47.  The Sixth Circuit and nearly every other circuit has held that, in order to establish a disability under the ADA, a plaintiff must prove that his impairments substantially limit him in a major life activity in comparison to <u>most people</u>, rather than comparison to his/her theoretical absolute maximum potential.  *See, e.g., Gonzales* 225 F.3 at 69, 81-82*; Singh v. George Washington University School of Medicine and Health,* 508 F.3d 1097, 1102 (D.C. Cir. 2007); *Wong v. The Regents of the University of California,* 410 F.3d 1052, 1065 (9th Cir. 2005); *Ristrom v. Asbestos Workers Local 34 Joint Apprentice Comm.*, 370 F.3d 763,769 (8th Cir. 2004); *Palotai v. Univ. of MD at Coll. Park*, 38 Fed. Appx. 946, 955 (4th Cir. 2002); *Emerson v. N. States Power Co.*, 256 F.3d 506,511 (7th Cir. 2001); *Bowen v. Income Producing Mgmt. of Okla. Inc.*, 202 F.3d 1282,1287-88 (10th Cir. 2000); *Bercovitch v. Baldwin Sch. Inc.*, 133 F.3d 141,156 (1st Cir. 1998); *Soileau v. Guilford of Maine Inc.*, 105 F.3d 12, 15-16 (1st Cir. 1997). [3]

Jenkins' experts' assertions that his "superior" intelligence has allowed him to compensate for the deficiencies that he has in reading is either irrelevant or proof that he is not disabled.  As the court noted in *Gonzales*:

> Even if self accommodations enhanced plaintiff's performance to that of most people, he is not disabled under the ADA.  Recently the Supreme Court ruled that in determining whether individuals are disabled under the ADA, they should be examined in their corrected state. . . . [T]he [U.S.] Supreme Court [has] held that an individual whose body developed coping mechanisms was not disabled within the framework of the ADA.

---

[3]        The argument that disability is established through a disparity in anticipated performance based on intelligence, or IQ, and actual performance – the "discrepancy theory" advanced by Jenkins – has been dismissed by the majority of courts that have addressed it where, as here, the actual performance is average as compared to most people.  *See e.g. Singh* and *Price.*  In  *Rush v. National Board of Medical Examiners,* 268 F.Supp.2d 673 (N.D. TX 2003), relied on by Jenkins, the court found that Rush's impairment <u>did</u> significantly restrict his ability to perform a particular major life activity as compared to the average person in the general population.

*Gonzales* 225 F.3d at 630, citing *Sutton v. United Airlines, Inc.,* 119 S.Ct. 2139, 2146 (1999); *Murphy v. United Parcel Serv., Inc.,* 527 U.S. 516, 521-22 (1999); *Albertson's Inc., v. Kirkingburg,* 527 U.S. 555 (1999).   Lacy testified that Jenkins had likely developed the reading and comprehension skills necessary to do mainstream work and acknowledged that on all reading decoding tests Jenkins had taken since 1991 he had performed at an average level or better.  Lacy DP, p. 42. Thus, if Jenkins' superior intelligence has permitted him to compensate for his impairment, his performance is nonetheless at the average to above average level, and such self accommodation does not alter the finding that Jenkins is not disabled.

**D.     JENKINS WILL NOT SUFFER IRREPARABLE INJURY IF THE INJUNCTION DOES NOT ISSUE**

Jenkins was last scheduled to take the USMLE Step 1 on December 18, 2007 in Amarillo, Texas.   However, at the time this action was initiated on December 5, 2007, in the District Court for the Northern District of Texas at Amarillo, Jenkins had chosen to cancel his registration on November 29, 2007, and test taker.  *See* Deitch Aff., para. 9 and 10.   Eligible registrants for the Step 1 exam must select a three (3) month eligibility period to take the exam, then schedule to test on a specific day within that period.  Deitch Aff., para. 8.  Jenkins' current registration entitles him to take the exam any time through the last day of February 2008. PL DP, p. 11.  The Step 1 examination is offered five (5) to six (6) days per week, fifty (50) weeks a year, at selected Prometric, Inc. test centers across the United States.   Deitch Aff., para. 7. Jenkins is free to register for the exam at any time within his current eligibility period. Accordingly, there is no risk of harm that Step 1 will not be available to Jenkins if immediate relief is not provided.   In addition, Jenkins may chose to extend his registration period for an

18

additional three (3) month period upon payment of a fee of $50.00. PL DP, pp. 11-12; Deitch Aff., para. 8.

Jenkins' assertion that the failure to take the Step 1 on December 17, 2007 would likely end his medical education is without merit.  Complaint, para. 7.  Jenkins initially requested and received permission from the University of Louisville School of Medicine ("ULSOM") to miss the first clinical rotation of his third year to permit him to study and take the Step 1 exam. Jenkins made this request in March of 2007, following the first denial of his request for accommodation. Following the second denial, Jenkins appealed to the medical school.  PL DP, p. 8.  The Educational Administrative Committee and Dean of the School of Medicine agreed to waive the requirement that Jenkins pass the Step 1 as a prerequisite to commencing his initial clinical rotations.  Exhibit 2 to PL DP and attached hereto as Ex. 3.  Under the terms of the letter, Jenkins was not required to pass Step 1, but was merely required "to at least take it."  PL DP, p. 9.  Despite this waiver, Jenkins chose not to take the exam in either late November as initially anticipated or in December. He has now been granted administrative leave by ULSOM and has the option of starting back to school in the next rotation once he has taken Step 1.  PL DP, p. 11. The only time constraint placed on Jenkins by ULSOM is that he is expected to complete the medical school curriculum in 6 years and pass Step 1 and Step 2 before he graduates.  PL DP, p. 19.  As for the states' licensure requirements, there is no significance to the December 17th or February 21st test date so long as he eventually passes the test.

In *Baer v. National Board of Medical Examiners,* 392 F.Supp. 2d 42 (D.C. MA 2005), the plaintiff filed an action in the district court seeking a preliminary injunction just three weeks before her scheduled test date, yet three months after NBME denied her fourth request for an

accommodation.   The court was not persuaded that she faced imminent harm, finding that the alleged urgency of the petition was self-inflicted.   *Id.* at 49.   Similarly, Jenkins was aware as early as August 29, 2007 that his reapplication for a testing accommodation had been denied, yet he filed this action less than two (2) weeks prior to his own initial chosen testing time.

Moreover, Jenkins has chosen, of his own volition, not to take Step 1 despite being eligible. Jenkins testified that he plans to take the examination in February, irrespective of whether he is provided an accommodation.  PL DP, pp.17-18.   Jenkins acknowledged that if he fails the exam he may take it again.  P. 12.    In fact, there is no limit to the number of times Jenkins may retake the Step 1. [4]  Of course, Jenkins may pass the exam.  Jenkins testified that he knows the material that is the subject of the Step 1 exam sufficiently to pass.  P. 13.  Jenkins' real concern is that he may not pass the exam with as high a score as he would like. Complaint, para. 38 .  Unlike the ACT, Jenkins cannot take the Step 1 multiple times until he achieves the score he desires.  Once examinees pass a Step, they are not permitted to retake that examination. Jenkins alleges that by not achieving as high a score as he may be capable of achieving with extra testing time, his residency options will be limited. *Id.*   However, the ADA is not a mechanism to be used by individuals to optimize their scores, but is intended to provide disabled individuals equal access to the test.

At most, Jenkins' medical education has been delayed as a result of his own decision not to sit for the exam.   However, "mere delay of educational opportunities does not constitute

---

[4]      While the NBME sets no limit to the number of times eligible examinees may retake a Step, the USMLE recommends to medical licensing authorities that they require applicants to pass Step 1, Step 2 and Step 3 examinations to occur within a seven (7) year period, and allow no more than six (6) attempts to pass each Step without demonstration of additional experience acceptable to the licensing authority. The time limits, if any, are within the purview of the individual state licensing authorities.

irreparable harm." *Rothberg v. Law Sch. Admission Council*, No. 04-1060, 2004 SL 1345130, at *3 (10th Cir. June 16 2004); s*ee also, Dogon v. National Bd. of Med. Exam'rs*, No. 98-10967-PBS, slip op. at 2 (D. Mass. June 10, 1998) ("Even the possibility of delayed graduation from medical school is not a basis for <u>irreparable</u> harm necessary to satisfy the standard for preliminary injunction."). Moreover, such potential injury—delay and the possibility of having to transfer to another medical school—is precisely the kind of injury that is redressed by monetary damages and is insufficient to support a finding of irreparable harm.

## E.   THE ISSUANCE OF AN INJUNCTION WILL RESULT IN HARM TO OTHERS AND THE PUBLIC INTEREST

Granting Jenkins' motion would be contrary to the public interest and detrimental to the NBME and score users, as well as other test-takers.  The USMLE is an examination utilized throughout the United States to test the minimum competency of individuals who wish to be licensed as physicians.  All fifty states and four U.S. territories require the successful completion of the USMLE as a prerequisite to obtaining a medical license and they rely on the integrity and validity of the test.  The NBME is responsible for ensuring that the USMLE impartially tests the knowledge and skills of aspiring physicians, that the examinations are administered under standard conditions, and that no examinee or group of examinees receives an unfair advantage.  *See* Deitch Aff., para. 2.

The NBME has developed standard procedures for making individualized decisions about requests for accommodations.  *See Powell v. National Bd. of Med. Exam'rs*, 364 F.3d 79, 88-89 (2d Cir. 2004).  If the NBME were to extend accommodations to examinees who have not established by the requisite documentation that they are disabled under the ADA, the integrity of the organization would be called into question as would the entire testing program.  "As

21

administrator of the national exam used by a number of states for licensing medical doctors, the National Board has a duty to ensure that its examination is fairly administered to all those taking it." *Powell*, 364 F.3d at 88-89.   The public has the right to expect that licensed medical doctors have demonstrated minimum competence.   Accordingly, the public interest requires the objective, fair and standardized testing of those who seek to become licensed physicians.

In addition, other individuals who take the examination without the benefit of extra time would be harmed by the unfair advantage given to Jenkins.   The accommodation sought here, if granted, also disadvantages those with documented disabilities by recreating the uneven playing field the ADA was designed to level.   As the *Price* court explained:

> If a court were to grant testing accommodations to persons that do not have disabilities with the meaning of the ADA, it would allow persons to advance to professional positions through the proverbial back door.   In so undermining the integrity of the USMLE, that could would hinder the Board's ability to distinguish between qualified students and unqualified students.

*Id.* at 422.

### III.   CONCLUSION

The evidence does not establish that Jenkins is disabled under the ADA.   Therefore, he is not entitled to any relief in this case, injunctive or otherwise.   Moreover, Jenkins is free to resume his medical studies at any time and to take Step 1 at his convenience.   Clearly, he will suffer no irreparable injury if the court refuses to issue the preliminary injunction.   Permitting him to take Step 1 with extra testing time in the absence of a disability is unfair to other

examinees and impugns the integrity of the testing process on which state licensing authorities

rely. For these reasons, Jenkins' motion must be denied.

Respectfully submitted,

**STURGILL, TURNER, BARKER
 & MOLONEY, PLLC**

/s/Stephen L. Barker
Stephen L. Barker, KBA # 03270
Katherine M. Coleman, KBA # 84089
333 W. Vine Street, Suite 1400
Lexington, KY  40507
Telephone:  (859) 255-8581
Facsimile:   (859) 231-0851
sbarker@sturgillturner.com
kcoleman@sturgillturner.com
**Attorneys for Defendant**

## CERTIFICATE OF SERVICE

On February 1, 2008, I electronically filed this document through the ECF system, which will send a notice of electronic filing to:

Vincent E. Nowak
venowak@mhba.com

/s/Stephen L. Barker
Stephen L. Barker, KBA # 03270
Attorney for Defendant

g:\wp61\doc\slb\nbme\pleadings\brief in opp to inj\drafts\brief draft 4.doc