1019045 5-194-442-9
Reconsideration Request L

June 18, 2007

Disability Services
National Board of Medical Examiners
3750 Market Street
Philadelphia, PA 19104-3190
(215) 590-9509

RE: Reapplication cover letter

NBME Disability Services:

I would like to reapply for time and one half accommodations on the USMLE step 1 examination. Now being more familiar with the 1990 Americans with Disabilities Act (ADA) and relative case law I have decided to add new information to my file. Please allow me to clarify previously undressed aspects of my application outlined in your May 18, 2007 letter and also justify why I should be covered under ADA. Please advice me **before** a final decision is made if any of my documentation is incomplete or unclear. I would like to facilitate your decision in anyway I can.

NBME's May 18, 2007 letter denying me accommodations outlines information that my originally submitted documentation failed to address adequately. In paragraph two NBME states, "Learning difficulties of sufficient severity to substantially compromise reading and learning are generally recognized as being developmental in nature. Consequently, it is expected that chronic and pervasive difficulties with reading or learning will emerge during childhood."

- Enclosed is a letter from my preschool and kindergarten teacher Carol Blevins stating that in preschool my disability had emerged and limited the manner in which I could learn effectively.
- Mrs. Blevins documents that I received additional individual instruction to accommodate my learning deficit in reading.

NBME later states in paragraph two, "…no school records, such as grade reports, results of standardized tests, transcripts, etc., were provided to demonstrate that you have experienced longstanding and substantial impairment with respect to reading and learning."

- Enclosed is a 1991 Multidisciplinary Team Report documenting placement into Learning Disability (LD) classes in the third grade.
- Enclosed is a 1991 Individualized Education Program (IEP) Report documenting daily remediation work received as a student in Mrs. Anderson's LD class.
- Enclosed is a written letter from school psychologist, Michael Gontarz, Ed.D., explaining LD placement in Wisconsin is not based on one test or one person's opinion. A panel of my regular education teachers, parents, a clinical psychologist and LD teacher unanimously concluded that I had a *specific learning disability* stating, "Due to academic delays Kirk cannot successfully achieve in regular

RECEIVED
JUL 1 9 2007
Disability Services

EXHIBIT D

education." All M-Team members agreed my learning style was substantially limited enough to justify LD placement.

In paragraph four NBME states, "Professionally recognized *diagnostic standards* for a learning disorder presume the existence of an *underlying central nervous system dysfunction...*"

- I am unaware of central nervous system dysfunction being at all referenced under ADA information as a recognized diagnostic standard necessary to be substantially limited in learning.

Later in paragraph four NBME writes, "overall performances on a range of cognitive and academic achievement tasks across four evaluations from 1991 to 2007 are well within the range of average functioning and do not demonstrate cognitive or academic deficits that substantially impair your ability to read, write, or learn relative to the general population."

- Dr. Gontarz's 1991 evaluation does document academic deficits. He notes, "Teachers have been concerned from year to year about Kirk's academic progress in spelling, written language, and reading."
- This evaluation conducted in January of 1991 should have put my achievement scores at the 3.5 grade level. My 1991 Kaufman Test of Educational Achievement results demonstrate spelling scores at grade levels 2.1 (almost a year and a half behind), reading decoding at 2.6 (almost a full year behind) and overall reading at 3.0 (a half year behind). These scores quantify my academic deficits.
- Dr. Gontarz further wrote in the same 1991 evaluation that I was "½ to ¼ grade year behind in reading, and 1 to 1 ½ grade years delayed in spelling", again documenting academic deficits.
- Dr. Gontarz's evaluation was used to place me in special education LD classes within the framework of the Individuals with Disabilities Education Act as demonstrated by my 1991 IEP that I have submitted. This IEP could only be justified if substantial impairments in learning existed.
- It is also important to note that though a decreased reading speed was observed **no fluency scores were scaled, nor required, in 1991, 1999 or 2003.**

In paragraph five NBME points out Dr. Gontarz's observation, "Although reading decoding is near the discrepancy level, Kirk's comprehension is not. Therefore it is questioned if reading should be considered an EEN." The NBME evaluator used this statement to support her belief that, "thus it appears that your reading ability as early as third grade was in the average range compared to same age peers."

- Gontarz writes, "We should continue regular education for reading with close monitoring by the learning specialist. If he is no longer able to compensate in reading as he has been doing or if regular education can no longer meet his needs, then we can include reading on his IEP." One can see Dr. Gontarz's comments were made not to say a deficit did not exist but rather that I needed to be closely monitored in case my compensatory skills could no longer mask my deficit.
- Enclosed is a letter from learning specialist, then my LD teacher, Mrs. Lori TeeGarden-Anderson stating that the decision was made to give me reading

ECEIVED
JUL 1 9 2007
isability Service

support. Reading instruction focusing on phonics components to improve reading fluency was implemented. Mrs. TeeGarden writes, "Kirk was only able to participate within the mainstream of regular education reading classes because of the supportive-instruction that he was receiving from his placement in the Learning Disabilities classroom." One can see my compensatory skills did not continue to mask my deficit.

Later in that paragraph NBME pointed out that no DSM diagnosis was assigned during the elementary school evaluation.

- The 1991 evaluation was not drafted to specifically address ADA criteria. It was completed under the regulations outlined by IDEA.
- At this time scaled fluency scores were not necessary.

In paragraph six NBME references Dr. Holmes 1999 statement, "the WIAT showed all achievement scores to be *technically* in the average range but all subtest scores except for Mathematics Reasoning are significantly below expectation."

- Dr. Holmes used a discrepancy among cognitive ability and academic achievement to support a learning disability, as this was sufficient criteria for ACT to allow accommodations. This evaluation documented clearly this discrepancy and it was in this light that that evaluation was presented.
- Meeting ACT standards does not rule out that a substantial limitation was not present. In fact Dr. Holmes ends the same paragraph from which the NBME's evaluator referenced the above statement by writing, "Several of the WIAT scores are below the level often considered to make the LD range."

NBME later in paragraph six points out again that Dr. Holmes in 1999 did not assign a DSM diagnosis.

- ACT did not require this diagnosis.
- Enclosed is a letter from John Lacy, PhD, HSPP stating that no scaled fluency measurements were administered until 2007.
- Dr. Holmes in 1999 does note the existence of a decreased reading rate recommending, "...that he (Kirk) make use of various strategies to improve his reading: slow down the speed, *seek extra time for tests involving significant elements of reading...*" One can see my fluency deficit was observed and referenced but it was not accurately scaled until my most recent evaluation.

In paragraph seven NBME again points out that a discrepancy model was used to justify accommodations on the MCAT. The evaluator writes, "It appears that your evaluator (Holmes) bases his 1999 comments and 2003 diagnosis upon discrepancies among your performances on various measures of cognitive ability and academic achievement."

- This was the criteria outlined by MCAT and it was in this light that the evaluation was constructed. Again this does not rule out a substantial limitation in learning.
- Dr. Holmes in his 2003 evaluation on page three of his intake note under symptoms categorizes my slow reading speed as being "severe."
- On page two of his progress note Holmes writes, "His (Kirk's) reading comprehension score was in the 4th quartile while his reading speed score was in the 1st quartile. This is an atypical combination such that his **reading speed** is

ℸ EIVEI.
IL 1 9 2007
bility Serv

**far below average** while his comprehension is above average. Such a pattern matches his history though." One can see that a fluency deficit was documented.

- Holmes later states, "Any task requiring reading with speed expectations produced his lowest scores. The strength still of his other language functions is encouraging but **may also result in others not readily recognizing his LD style.**" A fluency deficit was observed but it was not accurately scaled until later.
- Dr. Lacy's enclosed letter addresses my fluency deficit more thoroughly.

In paragraph eight NBME writes, "Dr. Lacy appears to base his diagnostic conclusion upon an ability –achievement discrepancy formula." The evaluator later writes, "Using an extreme 98th percentile IQ as the standard by which all other scores should be measured incorrectly presumes that all abilities should be evenly well developed."

- The NBME evaluator failed to make any reference to my current reading fluency score (14th percentile *when compared to the general population*) that is a full standard deviation below average.

Sec.36.309bi of the Americans with Disabilities Act states:

> The examination is selected and administered so as to best ensure that, when the examination is administered to an individual with a disability that impairs sensory, manual, or speaking skills, the examination results accurately reflect the individuals aptitude or achievement level of **whatever factors the examination purports to measure**, rather than reflecting the individual's impaired sensory, manual or speaking skills.

In seeking precedent the 2003 James Avery Rush, IV (Plaintiff) v National Board of Medical Examiners (Defendant) states:

> The United States Medical Licensing Examination, Step 1 (USMLE Step 1), is a timed multiple-choice examination **designed to test a person's mastery of the basic science underlying medicine and one's ability to utilize that knowledge.** The Step I examination is not graded on a curve; it is a mastery test. Because it is a mastery test, in theory 100% of the persons taking the Step 1 examination could pass, or fail, each time the test is offered. With a mastery test, the test taker either knows the material and passes the exam, or he does not know the tested-for material and fails the exam. Time constraints for most individuals who take this test are not of major consequence because the majority of medical students possess the reading and processing efficiency needed to work through the test and the set of possible answers within the time constraints that are allowed. **This is not true however for individuals with reading disabilities.**

One can see that the USMLE Step 1 is not a reading comprehension test. The exam's purpose is to evaluate a student's knowledge of medical material. Extra time to read will not magically put more knowledge in my head. Time accommodations will only allow me to demonstrate whether I possess adequate medical knowledge or not. The 2003 James Avery Rush, IV v NBME also states:

.CEIVED

JUL 1 9 2007

isability Service.

> The USMLE Step I examination involves and requires extensive reading, and scoring well and/or passage of the exam requires extensive subject-matter knowledge. Plaintiff has shown a sufficient causal connection between his reading impairment and his failures to score well, **or as well as he might**, on time-limited examinations requiring extensive reading. Plaintiff has shown that if he is accommodated he will be effectively tested not on his disability but rather on his subject-matter knowledge. Plaintiff has shown his reading impairment seriously decreases the rate at which he reads with comprehension. Plaintiff will suffer irreparable injury if the requested injunction is denied.

One can see my USMLE scores under normal time constraints would most certainly reflect the extent of my impairment due to my 14th percentile reading fluency score not allowing accurate demonstration of my medical knowledge aptitude. The above ruling also applies to me as Mr. Rush's deficit was due to "low reading and efficiency caused by a very low or very weak reading processing and decision speed." My documentation when taken as a whole presents a similar deficit.

- Enclosed is a personal statement describing how a decreased reading fluency has substantially limited my ability to learn throughout my educational development.
- Also enclosed is Dr. Lacy's letter validating my fluency deficit.

Finally in paragraph three NBME writes, "Your overall performances (composite) over three administrations of the ACT in 1998-1999 range from the 56th to 82nd percentile rank when compared to grade peers."

- If one looks more closely at my national (unaccommodated) ACT test results and compares them to my special (accommodated) ACT, one will find a scenario more consistent with my history. It is important to note that my unaccommodated 10/99 English and Mathematics scores vary only slightly from my accommodated 12/99 scores (English: 92nd-94th and Math: 85th-92nd). This is because these exams are far less dependent on timed reading.
- My Science Reasoning scores and most importantly my Reading scores vary significantly from the 10/99 to 12/99 exam (Science 65th-95th and Reading 64th to 99th). The above discrepancy is **not** an example of a discrepancy model based on *possible* cognitive ability compared to academic achievement, which as stated by NBME cannot be used as the sole basis for a diagnosis or rationale for accommodation. The above is a startling discrepancy between academic achievement and *demonstrated* academic achievement with accommodation.
- This demonstrates, like James Avery Rush IV, "that if he is accommodated he will be effectively tested not on his disability but rather on his subject-matter knowledge," and that, "sufficient causal connection between his reading impairment and his failures to score well, **or as well as he might**, on time-limited examinations requiring extensive reading."
- Nothing in my documentation is presented that would lead one to the conclusion that if I had been granted accommodations on the PSAT as well that a significant achievement-to-achievement discrepancy would have presented.

RECEIVED

JUL 1 9 2007

Disability Services

The 1990 Americans with Disabilities Act (ADA) provides comprehensive civil rights protection for "individuals with disabilities." ADA defines an individual with a disability as a person who:

> Has a physical or mental impairment that substantially limits one of more major life activities, or
> Has a record of such an impairment, or
> Is regarded as having such an impairment.

It defines "physical or mental impairment" as including *specific learning disabilities* and also defines "major life activities" as including *learning*. My *Learning Disability* is best defined currently as a reading fluency deficit that substantially limits my ability to learn when compared to the general population. My submitted documentation justifies that I have a long standing letter decoding, written language, fluency reading and spelling deficit that has for my entire academic career significantly limited my ability to learn. To deny this is to go against numerous personal accounts and evaluations completed by my teachers, LD reading specialist, three different psychoeducational evaluators and academic records that clearly demonstrated achievement discrepancies on timed standardized test scores. Also outlined above is the purpose of the USMLE Step 1, which is to evaluate medical based science knowledge. Time accommodations should have no effect on the amount of medical knowledge I display on the exam. As stated above, "With a mastery test, the test taker either knows the material and passes the exam, or he does not know the tested-for material and fails the exam."

Again, please advice me **before** a final decision is made if any of my documentation is incomplete or unclear.

Thank you,

Kirk D. Jenkins
3rd Year Medical Student
University of Louisville School of Medicine

REDACTED

Encl.
- Personal statement
- M-Team Report
- Individual Educational Program Report
- Letter from John M. Lacy, PhD, HSPP
- Letter from Michael Gontarz, MSEd, NCSP
- Letter from Lori TeeGarden
- Letter from Carol Blevins

RECEIVED
JUL 1 9 2007
Disability Services

1019046 5-194-442-9
Personal Statement

June 18, 2007

Disability Services
National Board of Medical Examiners
3750 Market Street
Philadelphia, PA 19104-3190
(215) 590-9509

RE: Self-report/personal statement

I might have been the most excited preschooler ever to walk through the doors of the Montessori Preschool in Wausau, Wisconsin. I was ready. It was my time to start diving into books like my older sister and parents. My sister had told me that school was where one learned to read.

This was the beginning of my love/hate relationship with school. I loved going to school as a child. I loved the school bus, having my own Ducktails lunch pail, gym, art, music, playing soccer at recess and even naptime. Where else could a 5 year old have that much fun in one day? But there was always one part of my day as a young child that I couldn't stand. Reading and spelling class were always the worst part of my day. It was the only time in the day that I ever got yelled at by my teacher. Mrs. Carol would always say, "Kirk stop guessing and sound it out," or "No, no, no Kirk, you've read that word before, sound it out."

Reading class used to make me physically ill. The one thing that had motivated me to go to school had now become almost intolerable. In preschool and kindergarten we had short books that we were supposed to methodically go through with our teacher. All of my friends, even the children a year younger than I, were all 4-5 series ahead of me in the reading books. I remember feeling stupid. I remember being angry when my friends got to go out to recess while I stayed inside with Mrs. Carol and spent extra time struggling to learn to read. My parents were nice enough to tape my favorite show Ducktails at 2:30pm. My friends would all watch it after they got home from school. I never was able to see the show air while in kindergarten because I stayed after school by myself to work with Mrs. Carol on phonic reading.

My parents and I used to argue about me receiving extra help learning to read. It separated me from the other kids. I hated that. It forced me to miss recess and playing with my friends after school. It even got me in trouble with my teachers. I hated being a troublemaker. I was always the last one to finish the lesson for the day. I always had homework even when all my classmates got everything done during class.

These feelings of embarrassment, anger and self-doubt only grew more prominent as I entered grade school. My parents were always talking to my teachers. By the time I got home my mother always knew more about the day's lesson in reading and spelling than I did. She had figured out that when I told her that I had no homework I was lying. She knew this because she had already received the week's lessons from my first and second

RECEIVED
JUL 1 9 2007
Disability Services

grade teachers. Every morning my mother and I got up two hours before I had to leave for school to work on my spelling flashcards and every afternoon when I got home from school I had to sit at the kitchen table and go back over all my homework with my mother even if I had already completed it during class. Even with this considerable extra effort coordinated by my parents I fell far behind my peers in reading and spelling.

It is for these reasons that in the third grade I was pulled out of class to meet with Dr. Gontarz, the school district's psychologist. I remember not totally understanding why I was the only one in my class that yet again had to miss gym class and recess to explain funny pictures and do math problems for a man that was not even a teacher. My parents explained to me later that Dr. Gontarz's testing was what allowed me to receive specialized LD reading and spelling work in Mrs. Anderson's LD classes throughout grade school. With Mrs. Anderson I was able to work on phonemes and decoding skills that eventually helped improve my poor reading but this did not fix my disability

Though only in the third grade I was starting to understand that there really was something different about the way I read compared to my classmates. Certain classes in grade school like social studies and science where the teacher would tell us about the lesson or read to us from a textbook were easy. I loved raising my hand to answer oral questions in front of the class. I purposely would pay attention as closely as I could to answer the difficult questions as to let all of my classmates know that I was not stupid. To my surprise I soon learned that if I didn't understand something, my classmates often didn't understand it either. I learned that if I helped my classmates with things that I was good at, science, social studies, math, gym, art and music my classmates wouldn't make fun of me whenever I was asked to read aloud.

Even though my hand was always the first up to answer a question, I NEVER volunteered to read aloud. This was because though all of my peers had mastered reading aloud, I would stutter though words, often make mistakes and have to sound out words that my classmates all thought were easy. I would see words on the page differently and pronounce them wrong. Often the teacher would takeover reading for me because I was taking to long or because other kids in the class began to poke fun mimicking my poor reading style of sounding out every word no mater how simple or difficult. This teasing for my inability to read continued into middle school and to this day my embarrassment prevents me from reading aloud in public unless I have practiced the passage many times on my own.

Getting out of reading in front of the class was the only reason why I agreed to go to LD classes in the third grade. This way I only had to read for the most part in front of one teacher. I didn't have to read in front of the class. My teachers also began to allow me to bring all of my daily coursework home to go over with my parents outside of class. It was around this time period I began to realize that if I stayed later to finish tests, often during recess or Phy. Ed., I could pass exams. Preschool and now grade school had taught me that if I worked hard outside of the normal classrooms with LD teachers and took more time to do my homework and complete tests I didn't have to be the stupid kid.

RECEIVED

JUL 1 9 2006

Disability Services

I didn't have to be the student that held up class, got made fun of or had to retake tests and redo homework.

In middle school the teacher would read our lessons or a student in the class would volunteer to read. When this happened all I had to do was listen and follow along. Unfortunately many reading assignments were given in class. I was not able ever to finish them during class. I had to take them all home, work on them during study hall, or stay after class. I could not get through the material that other students were expected to get though during class.

In high school I was constantly asked by friends, classmates, teachers and faculty how a student in all of the accelerated science, math and history classes could then also be in LD reading and spelling classes. Not intermediate or lower level reading and spelling classes but specialized LD needs classes. My answer has always been, "Once I have an idea or concept in my head, I can do with it whatever I need to. I can apply it, I can work with it, I can rationalize it and even test it against other ideas. My problem is that it takes me longer to get it up there in my head."

How does this affect me on a day-to-day basis outside of learning environments? I can't go to movies with subtitles because I can't read the dialogue fast enough. When I am at church and the congregation reads aloud I can't read with them because I make mistakes and read to slowly forcing me to listen and follow along. Hymns I have never sung before I often won't sing because I can't keep up with the pace or reading.

However my life is not lived outside of the learning environment. The entire curriculum in public schools that I have experienced since the first grade, into high school and finally through medical school has always been heavily based on the ability to learn concepts from written text. This text can take the form of textbooks, student notes, PowerPoint slides and written exams. PowerPoint slides for me are impossible because I am never able to finish reading the slide before the presenter goes on to the next topic. I have never been able to finish a reading assignment in class always having to allot time outside of class to finish. If a class did not allow me to take material home, I was forced to either buy the book myself so I could read it on my own or photo copy what I didn't finish in order to take more time to finish my assignments. I have always received accommodations on exams throughout my entire academic career in order to finish written exams.

My major life activity is reading and learning. This is what I do everyday of my life and have been doing ever since I can remember. The difference--- I do not read, learn or process information the same way the general population does. I never have. My psychoeducational evaluations have been consistent since the third grade demonstrating my deficit in reading and processing information. My current reading fluency scores are a full standard deviation below average when compared to the general population. I have always been substantially limited in the rate in which I read with comprehension. I have consistently addressed limitation in learning through LD specialized, phonic reading and spelling curriculum beginning in preschool.

RECEIVED
JUL 1 9 2007
Disability Services

My reading fluency deficiency has substantially limited my ability to learn. I have always had to schedule in substantial amounts of extra time in order to cover the same amount of written material as someone in the general population. I have continually had to coordinate with teachers and professors to receive accommodations in order to obtain mastery of a topic. This consists of going to additional office hours outside of class to finish reading PowerPoint slides I was unable to keep up with during class. I have even asked teachers to photocopy material presented in order to allow me to completely cover the amount of text presented in class on my own. I regularly have scheduled extra time with teachers to go over my handwritten notes in a one-on-one environment because often I am unable to keep up with the rate in which material is presented, especially if the lecture requires large amounts of reading from the board or overhead. I would use these additional meetings with teachers to add in material to my notes that I was unable to copy during class.

The significant amount of additional time that it takes me to read, comprehend and employ additional strategies substantially limits my ability to learn because it allows less time for me to review and apply the covered curriculum. This inhibits my ability to learn.

At different times throughout my education I was unable to completely read all of the necessary material outside of class due to time constraints. This again substantially limits my learning of required material. Not finishing reading assignments consistently occurred in middle school and high school English/novels classes, college history/humanities classes and has become an almost unbearable source of stress now that I currently am dealing with the incredible course load that medical school requires.

My substantially decreased reading fluency has limited me in my ability to finish multiple choice exams in the normally allowed time. Forcing me to take an exam under time constraints designed for an individual with a normal reading rate does not allow me adequate time to process test information. This effectively makes the exam substantially more difficult for me than someone with an average reading fluency. Time accommodations have always allowed me to be evaluated on my subject-matter knowledge, not the extent of my reading disability. It is my hope that you will allow my future testing to reflect my sum knowledge of subject matter, not to be altered by the time restraints of my reading impairment

Thank you for your time and consideration.

Kirk D. Jenkins
3rd Year Medical Student

RECEIVED
JUL 19 2007
Disability Services

REDACTED



1019052 5-194-442-9
Undated (Lacy)-Evaluation

# JOHN M. LACY, PH.D., HSPP

**Licensed Clinical Psychologist**

**1700 UPS Drive, Suite 208**
**Louisville, KY 40223**

**Phone: (502) 412-9197**
**Fax: (502) 412-8701**

TO: Kirk Jenkins

REDACTED

FROM: John M. Lacy, Ph.D.
1700 UPS Drive, Ste. 208
Louisville, KY 40223

RE: 5/18/07 NBME response to your request for USMLE Step 1 accommodations

Mr. Jenkins,

I have reviewed Dr. Catherine Farmer's response that documents NBME's reasons for denying your request for extended time on the USMLE Step 1, and I want to share what I believe are valid responses to several of the points Dr. Farmer made in the course of reviewing your historical documents and psychoeducational reports. For the sake of stylistic consistency with the reports I discuss in this letter, I refer to you in the third person after this point. I also place in parentheses the location of each of Dr. Farmer's statements within her letter that I discuss.

(Page 1, paragraph 2): Dr. Farmer states that "Learning difficulties of sufficient severity to substantially compromise reading and learning are generally recognized as being developmental in nature. Consequently, it is expected that chronic and pervasive difficulties with reading or learning will emerge during childhood." Dr. Michael Gontarsz' 1991 psychoeducational report establishes that Mr. Jenkins' reading and spelling in the classroom were of sufficient concern to his teachers to prompt a referral for more formal testing by the time he was in the third grade. It is well established that only selected students in our educational system are referred for one-to-one psychoeducational testing, so it is more reasonable to assume that he was exhibiting reading and spelling difficulties in the classroom than to assume that he was not. Thus, Dr. Farmer's assertion that learning difficulties are "developmental in nature" is quite consistent with Mr. Jenkins' historical documents that date back to his third grade year. In addition, Dr. Gontarsz' reference to his "family history of learning problems" is consistent with current theories and research regarding learning

RECEIVED JUL 1 9 Disability Services

disorders. If, as I contend, Mr. Jenkins' learning disorder is primarily one of low reading fluency, the untimed K-TEA academic achievement tests he was given by Dr. Gontarsz would be unlikely to reflect this problem, but his performances on a wide range of classroom tasks *would* be likely to alert his teachers to a reading problem that might not be accurately labeled upon referral or identified through one-on-one testing. Although Dr. Farmer emphasizes Dr. Gontarsz' conclusion that "it is questioned if reading should be considered an EEN," it is noteworthy that less than one month later, and with Dr. Gontarsz' report in hand, Mr. Jenkins' case conference committee (which included Dr. Gontarsz) concluded that he did have a learning disability and placed him in LD Resource programming. It is stated in his 2/07/91 Multidisciplinary Team Meeting document, *"Regular education rejected since Kirk's learning difficulties require more assistance than what regular education can provide. ...Given Kirk's learning delays, regular education alone cannot adequately and appropriately meet his needs."* As a psychologist who has performed many psychoeducational evaluations and case conferences with several school corporations over a span of twenty years, I believe Dr. Farmer was not justified in emphasizing selected portions of a 1991 psychoeducational report and drawing a conclusion regarding Kirk's functioning levels and need for special education programming sixteen years after the fact that opposes the conclusion of a group of professionals who were specifically entrusted with that decision and in contact with him at the time.

(Page 1, paragraph 3): Dr. Farmer refers to Mr. Jenkins' CTBS Total Reading performance that was better than those of 89% of his grade peers. Mr. Jenkins has reported that he did receive the accommodation of extra time on many of his tests through his elementary, middle and high school years, though he cannot recall whether he received that accommodation on this fifth grade test. It is my impression that either of two conditions - 1) the CTBS being given under extended time conditions or 2) the CTBS not including a reading *fluency* measure - could account for Mr. Jenkins' above average score. Either way, it is clear that his accommodation of extra time on many of his regular classroom tests, along with other accommodations he may have received secondary to his LD classification, make his class grades less dependable measures of how well he might have functioned in school without accommodations.

(Page 1, paragraph 4): Dr. Farmer states, "...your overall performances on a range of cognitive and academic achievement tasks across four evaluations from 1991 to 2007 are well within the range of average functioning and do not demonstrate cognitive or academic deficits that substantially impair your ability to read, write, or learn relative to the average person in the general population." In my opinion, the question is not one of whether Mr. Jenkins can utilize phonics to decode words and/or utilize concept imagery and working vocabulary to comprehend text, but whether there is an underlying neurological process that

RECEIVED JUL 1 9 2007 Disability Services

slows down the speed at which he can engage in one or both of these processes. A reading fluency problem cannot be directly measured by educational, psychological or medical tests of cognitive functions other than reading fluency. All of the tests given to Mr. Jenkins over the years to 'quantify' his reading difficulties (difficulties that were observed and reported by those who taught him on a daily basis) assessed other reading skills that were not and are not below the norm, but are simply far below his broad cognitive abilities and expected achievement level. However, *when he was finally given a direct measure of his reading fluency in 2007, he obtained a Standard Score of 84 and age-based Percentile Rank of 14 on this subtest. This Standard Score is below the norm within the general population.* On (page 2, paragraph 3) of her letter, Dr. Farmer ignores Mr. Jenkins' Reading Fluency Standard Score and instead refers to his Standard Scores in two areas (Broad Reading and Broad Written Language) that are not germane to the issue of a reading fluency disorder. It appears to this evaluator that Dr. Farmer selectively focused on statements and scores in several of Mr. Jenkins' historical documents that could be used to deny his request for extra time on the USMLE Step 1, while she made little or no mention of the data and conclusions that support his request.

(Page 2, first full paragraph): Dr. Farmer states that "currently validated theories and research do not support using a discrepancy model as *the sole basis* of a diagnosis or rationale for accommodations." As noted earlier in this response letter, Mr. Jenkins was initially referred for testing in the third grade because his teachers *observed* his struggles in the classroom, and the Multidisciplinary Team determined that he should be placed in LD Resource programming because of both his test scores and his teachers' observations. Thus, this group of educators acted in a manner *consistent* with Dr. Farmer's assertion that more factors than just discrepancy scores should form the basis for diagnosis and accommodations. In addition, Dr. David Holmes states in his 8/25/03 psychoeducational report that Mr. Jenkins' "...reading seems impacted when timed," and he did not link this problem to any of the Standard Scores obtained in his evaluation.

(Page 2, paragraph 2): Dr. Farmer states that "Using an extreme 98th percentile IQ as the standard by which all other scores should be measured incorrectly presumes that all abilities should be evenly developed." I am aware that individuals are expected to have profiles in any broad area of functioning that contain relative strengths and weaknesses, but I am also aware that one of the central purposes of measures of central tendency (such as means and standard deviations) is to identify intra-individual discrepancies that should be considered significant. I submit that the difference between an IQ (Standard) Score at the 98th percentile and a Reading Fluency Standard Score at the 14th percentile is, in combination with a history of reading slowly and needing extra time on reading-based tests, both significant and sufficient for determining that a reading fluency disorder exists.

RECEIVED 1 9 2007 Disability Services

(Page 2, paragraph 3): Dr. Farmer states that "... the ADA covers individuals who are substantially limited in a major life activity." As a medical school student, Mr. Jenkins' most frequent and important daily pursuits (i.e., major life activity) involve meeting all of the educational requirements necessary to remain in medical school. If passing a specific test is required in order to continue as a student, then it doesn't matter if that test isn't a daily activity. It is clearly viewed as a *representation or measurement* of Mr. Jenkins' daily activities as a student. However, such a test is only representative in its content, and I suspect there is no research support for considering the time in which a student finishes the USMLE Step 1 to be a valid measure of his or her mastery of the material. If he is handicapped because his reading fluency lies significantly below all other reasonable measures of your knowledge and abilities as a medical student, *as well as below the norm within the general population*, then during a timed reading-based test he is handicapped and substantially limited in his pursuit of what is for him a major life activity.

(Page 2, paragraph 3): Dr. Farmer states, "Determination of whether an individual is substantially limited in functioning as compared to most people is based on assessment of the current impact of the identified impairment." It has been established that Mr. Jenkins does have a reading fluency disorder that handicaps his ability to read text as quickly as the norm within the general population, so the questions are 1) whether this disorder will cause him to fail the USMLE Step 1, and if so, 2) what will the impact of his failing this test be? It is doubtful that NBME has norms that show what impact a reading rate at the 14th percentile within the general population has on an individual's chance of passing this test, as it is doubtful that many individuals with this low level of fluency ever take this test. It is a statistical fact that most individuals who read at this rate also decode words, comprehend text and reason in general at or near this below average level. And yet, Mr. Jenkins is an individual who was diagnosed with both a learning disability and superior intelligence in childhood through the most widely accepted evaluation methods and who (with testing accommodations as needed) has passed the required tests thus far to gain admittance to medical school and progress to his third year in this demanding field of study. Dr. Farmer refers in her letter to "working harder than others" and "performing below one's expectations on standardized examinations in a competitive environment" as possible issues that Mr. Jenkins and all of his past evaluators might be confusing with a learning disorder. In this respect, she, and by extension, NBME contend that this evaluator, Dr. Gontarsz, Dr. Haynes, the Rothschild School Multidisciplinary Team, and all University of Louisville Medical School personnel who have chosen to grant Mr. Jenkins extra time on tests are misinterpreting the nature and severity of his condition.

CEIVED JU 9 2007 Disability Services

I remain available to assist in your appeal of NBME's decision in any professional capacity that I can.

Respectfully,

John M. Lacy, Ph.D. HSPP

RECEIVED
JUL 19 2007
Disability Services

1019051 5-194-442-9
7/2/07 (School Psychologi

# DC Everest Area Schools

6300 Alderson Street, Schofield, WI 54476
715-359-355-0302 X5825

July 2, 2007

Disability Services
National Board of Medical Examiners
3750 Market Street
Philadelphia, PA 19104-3190

Dear Board Members,

I am writing this letter in support of Kirk Jenkins who has requested test accommodations for the United States Medical Licensing Examination (USMLE) Step 1. I am under the impression that your board indicated that Kirk did not have a substantial limited leaning impairment that would require such accommodations. This letter is to substantiate that Kirk Jenkins did indeed meet eligibility requirements for a severe learning disability under state and federal laws in 1991 and has been receiving learning accommodations for those impairments throughout his educational career.

I was the district psychologist at the time of Kirk's referral for a special education evaluation in 1991 when he was a third grader. The reason for Kirk's referral was that his severe academic problems in spelling, written language, and reading substantially limited his daily progress. State and federal laws at the time of Kirk's evaluation required the IEP (Individual Educational Plan) team to determine whether there was a discrepancy between his expected achievement based upon overall cognitive abilities and his actual achievement functioning.

Kirk's evaluation results clearly indicated severe deficits in written language and spelling and, to some degree, reading. Please know that a person's demonstrated superior intelligence does not eliminate his/her eligibility for being considered learning disabled. While Kirk was found to have superior overall intellectual abilities, he was also found to have academic skills that were substantially below (more than 1.5 standard deviations below the mean) what can be expected based upon his cognitive performance. However, just showing a discrepancy between cognitive and functional academic achievement is not the only issue the IEP team considered. In such cases the IEP team also considers if the student's deficits significantly limit him/her from adequately performing in the classroom. In Kirk's case, the IEP team not only found him to be academically functioning far below expected levels given his excellent cognitive skills, but also found him to be substantially struggling in daily performance.

It should also be noted that the entire "IEP team" (not just one evaluator) legally determines a severe learning disability. Kirk's IEP team included a psychologist, a learning disability specialist, a principal, and classroom teachers. Daily classroom performance, evaluation results, developmental history, and medical and family factors are all considered in making such a decision. The particular team that evaluated Kirk's assessment results and made a determination of his eligibility for a severe learning impairment had significant years of experience evaluating and working with children who have learning disabilities. In addition, every educational and clinical psychologist and IEP team who have evaluated Kirk the past 16 years have substantiated the fact that Kirk is indeed learning impaired and in need of learning accommodations.

RECEIVED
JUL 19 2007
Disability Services

I am aware that the medical community has different guidelines in what determines a learning disability. One scenario that the educational system frequently encounters is when children are "identified" by a medical facility as learning disabled, yet are no where near the state and federal educational eligibility requirements for special education (thus not considered severely disabled). However, rarely, if ever, have we encountered a situation where the student has clearly been identified as learning impaired throughout his educational career, but not considered as such by a medical professional or board. In order for a student to be considered eligible for special education services, the child must meet the state and federal LEGAL eligibility requirements not just DSM IV criteria. Therefore, for the board to state that Kirk does not have a substantial learning impairment and is not in need of accomodations runs contrary to what all educational and clinical professionals have documented for 16 years.

After the 1991 IEP team determined that Kirk does indeed have a learning disability, the team then developed an IEP that specifically provided Kirk special assistance. This special assistance was in the form of direct services for written language and spelling as those were the areas that were most impaired. The main issue with Kirk's learning profile was that he had significantly high intelligence and knowledge, but had severe difficulty fluently and efficiently expressing these skills in daily work. His case is very similar to a person who has super intelligence/cognitive functioning, but who has expressive speech problems. If given ample time, the person with the speech impediment can verbally express the cognitive and academic skills he/she has. However, if not given the accommodation of extra time to express oneself, the listener may inappropriately label the speaker as being less intelligent than what he/she is. Kirk's profile indicates he has the superior cognitive skills to achieve. He certainly has the drive, motivation, and courage to help overcome any challenges that will hinder the performance of such skills. However, much like a person who has an expressive speech disorder, Kirk requires more receptive time to acquire/process the information being presented. Having substantially limited reading or writing fluency certainly does not mean that Kirk would not make an excellent physician. Given Kirk's educational history of learning disabilities, yet given his high motivation to overcome these impairments, achieve high school and college graduation, and successfully complete two years of medical school, would indicate that he has the "right stuff" to make a very well respected physician. He knows what suffering is. He personally knows about battling all the odds. Those are personal elements that add to the overall character of a great physician. Please do not limit a fine, talented person the opportunity to become a significant physician in the field of medicine. Given his history of learning impairments, Kirk deserves to take the Step 1 examination with limited accommodations.

I appreciate the board's willingness to read my letter and am hopeful that you will give this fine young man the chance of becoming an outstanding physician so that he can in turn serve all of us.

Most respectfully,

Michael Gontarz

Michael Gontarz, EdD, NCSP, LCP
Nationally Certified School/Educational Psychologist (NASP #102820)
Licensed Private Practice School Psychologist (WI #284-058)
Licensed Professional Counselor (WI #2363-125)

mgontarz@dce.k12.wi.us

RECEIVED
JUL 1 9 2007
Disability Services

Parent

FORM C

D. C. EVEREST AREA SCHOOL DISTRICT
6300 ALDERSON STREET, SCHOFIELD, WI 54476

INVITATION TO MULTIDISCIPLINARY TEAM MEETING

Dear Dr. & Mrs Jenkins    Date Jan 23, 1991

The district's multidisciplinary team (M-Team) is completing its evaluation of Kirk and will be meeting to discuss the results and to determine if your child has exceptional educational needs. You are encouraged to attend this meeting. It will be held at 3:30 PM (time) on 2-7-91 (date) at Rothschild School LD Room (location)

You may bring a friend or advisor to the meeting with you if you wish. If your child is a member of a minority group, a member of that minority may attend the meeting and help with the decision making process. The following are members of the M-Team:

| Name | Title/Position |
| --- | --- |
| C. Wangen | teacher |
| R. Colton | teacher |
| L. Teegarden-Anderson | LD teacher |
| M. Gontarz | school psychologist |
| | |

Each of these people has been involved in the evaluation of your child. Each will attend the meeting or be represented by someone who is knowledgeable about your child and the evaluation which was done. These other people may also be present at the meeting. While they did not conduct evaluations, they can contribute to the decision making process.

| Name | Title/Position |
| --- | --- |
| J. Harris | school principal |
| | |

Please indicate below whether you will attend the meeting and return one copy of this form to me. If you have any questions, I can be reached at 359-3186.

L. Teegarden-Anderson LD teacher
(Name and title of district contact person)

☒ 1. I/We will attend the meeting as scheduled.

☐ 2. I/We do not wish to attend the meeting. Please proceed without us.

D. Jenkins
Signature of parent or legal guardian

1/28/91
Date

9/1/90 cc: Parent (Original) __Director __Teacher __Principal

RECEIVED JUL 19 2007 Disability Services

1019053 5-194-442-9
IEP-School Records (eleme

6300 ALDERSON STREET, SCHOFIELD, WI 54476

FORM DI (EEN)

**NOTICE OF M-TEAM FINDINGS AND INVITATION TO INDIVIDUALIZED EDUCATION PROGRAM MEETING**

Dear DR AND MRS JENKINS, Date 2-7-91

On 2-7-91, a multidisciplinary team met to determine if your child had a need for speci[al] education. Enclosed is a copy of each report of findings proposed by the team. If there was more than one propos[ed] report, I have indicated the report which was approved. If you were not at the meeting of the team, you may request [a] conference to review the report(s). If you would like such a conference, you may bring a friend or advocate with yo[u]. Please call the person indicated below to arrange a meeting at a mutually agreeable time.

If there is more than one report, I approved the final report and rejected the others for the following reasons: CONSENSUS OF MTEAM MEMBERS

Michael J Gontarz
Signature of director/designee

We would like to meet with you to develop/review the individualized education program (IEP) to meet the educationa[l] needs of your child. You are encouraged to attend this meeting. It has been scheduled for 4:15 P.M. (time)

on 2-7-91 (date) at ROTHSCHILD (location) for KIRK JENKINS (child) DOB REDACTED

The purpose of this IEP meeting is to:

☒ Develop an initial preplacement IEP ☐ Review IEP following an evaluation

You may bring a friend or advisor to the meeting with you if you wish. The following school staff will be present at the meeting:

| Name | Title/Position |
|---|---|
| MICHAEL J GONTARZ | SCHOOL PSYCHOLOGIST |
| JIM HARRIS | PRINCIPAL |
| RANDY COLTON | REG. ED. TEACHER |
| LORI ANDERSON | LD SPECIALIST |

Please read the statement of parent and child rights enclosed with this invitation. Please indicate your decision below and return one copy of this form to me. If you have any questions, I can be reached at 359-3186.

The district is required by law to inform you about the consent which must be given by parents. Your consent is required for both evaluation and placement in special education. Those consents continue in effect unless you revoke them. You have the right to revoke your consent in writing at any time. If you revoke your consent for evaluation, the district may not do further evaluations and is prohibited by law from providing special education beyond three years after the last completed evaluation. If you revoke your consent for placement in special education, the district is not permitted to provide any further special education for your child. Please be aware that if you revoke your consent at some future time, the district may choose to initiate a due process hearing to allow it to evaluate your child without your consent.

MICHAEL J GONTARZ. SCHOOL PSYCH.
(Name and title of district contact person)

These consents are currently in effect for your child:
Evaluation: given 12-7-90
Placement: given ______

☑ 1. I/We will attend the meeting as scheduled.

☐ 2. I/We cannot attend a meeting as scheduled. I could attend a meeting at ______ (time) on ______ (date) at ______ (location).

☐ 3. I/We cannot attend a meeting in person, but would like to be involved by telephone at this number ______.

RECEIVED 1 9 2007 Disability Services

[signature] Jenkins
Signature of parent or legal guardian

Date 2-7-91

9/1/90 cc: Parent (Original) __Director __Teacher __Principal

D. C. EVEREST AREA SCHOOL DISTRICT
6300 ALDERSON STREET, SCHOFIELD, WI 54476
MULTIDISCIPLINARY TEAM REPORT

FORM CI
Page 1 of 3

Date 2-7-91
(M-Team Meeting)

REDACTED

| Child's Name Kirk Jenkins | Date of birth | Sex ☒M ☐F | Grade 3 |
|---|---|---|---|
| Parent/Guardian David and Deanne Jenkins | Address | | Telephone Area/No. |
| Date of Receipt of Referral 12-7-90 | Type of M-Team ☒ Initial ☐ Re-evaluation | Home Attendance Area Rothschild Elem | Service Location Rothschild |

I. Examination of existing data: (attach additional pages as necessary)

A. Summary of documentation from referral source.

Kirk was referred by M. Gontarz, school psyc. due to delays in written language, spelling and reading.

B. Summary of report of educational performance.

Reading: overall grade 2, although decoding skills are at beg. grad one level, due to Kirk's high intellectual abilities and contexual cue/coping strategies; Spelling: beg grade 2 level; Writ Lang - grade 1 level; Math - grade 4 level; Intellectual/Cognitive - superior range.

C. Summary description of previous interventions.

Kirk receives one-to-one and small group assistance when necessary.

D. Summary of health factors.

No significant difficulties

E. Summary of social behavior.

No significant difficulties

F. Child's learning style and how specific concepts or skills or both are acquired and used.

Appears to learn best through hands-on, multi-sensory approach.

II. Summary of consultation with parent(s):

Mother participated with discussions.

RECEIVED
JUL 19 2007
Disability Services

9/1/90 cc: __Director __Principal __Teacher __Parent

REDACTED

Date 2-7-91

D. C. EVEREST AREA SCHOOL DISTRICT
6300 ALDERSON STREET, SCHOFIELD, WI 54476

FORM C2
Page 2 of 3

Child's Name Kirk Jenkins DOB ______ Building Rothschild

III. M-Team determination of exceptional educational need:
(There must be a handicapping condition and a need for special education to be EEN.)

A. Does the child have one or more handicapping conditions? ☑ Yes ☐ No

1. The handicapping condition is:

- ☐ Mental retardation or other developmental disability
- ☑ Learning disability
- ☐ Emotional disturbance
- ☐ Speech or language handicap
- ☐ Physical handicap
- ☐ Visual handicap
- ☐ Hearing handicap

2. Documentation of eligibility criteria in PI 11.35 having been met for each of the identifie handicapping condition(s).

Kirk meets the eligibility requirements of average intelligence and 50% discrepancy of academic levels in spelling and written language.

B. Does the child need special education due to the handicapping condition(s)? ☑ Yes ☐ No
Documentation of the need for special education.

Deficits in spelling and written language make it difficult for Kirk to achieve in regular education alone with EEN services.

C. Recommendations regarding what related services the child may need.

- ☐ Occupational Therapy
- ☐ Physical Therapy
- ☐ Transportation
- ☐ Counseling
- ☐ Audiology
- ☐ Other *Specify* ______
- ☐ Psychological Services
- ☐ Recreation
- ☐ School Health Services
- ☐ Social Work Services
- ☐ Parent Counseling/Training
- ☐ Other *Specify* ______

Statement of reasons for the recommendations for related services.

RECEIVED
JUL 1 9 2007
Disability Services

9/1/90 cc: __Director __Principal __Teacher __Parent

Date 2-7-91

REDACTED

D. C. EVEREST AREA SCHOOL DISTRICT
6300 ALDERSON STREET, SCHOFIELD, WI 54476

FORM C3
Page 3 of 3

Child's Name Kirk Jenkins                    DOB _____   Building Rothschild

IV.  If the child does not have an exceptional educational need:
     A.  What are the child's non-exceptional educational needs?
         (Areas of educational need, which do not qualify as EEN)

     B.  What other programs may benefit the child (include information about those
         programs or services)?

M-Team members (each member must submit an individual evaluation report)

| Name and Title | Signature | Agree | Disagree | Report Filed |
|---|---|---|---|---|
| C. Wangen, teacher | | | | |
| R. Colton, teacher | R. Colton | ✓ | | 2-7-91 |
| M. Gontarz, school psyc | M Gontay | ✓ | | 2-7-91 |
| L. Teegarden Anderson LD teacher | Teegarden Anderson | ✓ | | 2-7-91 |
| | | | | |
| | | | | |
| | | | | |

Alternative M-Team reports from those members disagreeing with these findings must be
submitted. Each member of the M-Team must sign an M-Team report with which they are in
agreement.

Others present (parent, guardian, advocate, interpreter, consultant, student) Name and
Position/Title
James A Harris, Principal                    Deanne Jenkins

Director/Designee Action

A.  This M-Team report meets the requirements of s. PI 11.04 and
    _____ 1. is agreed to by a majority of the M-Team members.
              OR
    _____ 2. I have met with the M-Team and accept this report which has been agreed
              to by less than a majority of the M-Team.
    B.  Returned to the M-Team for further consideration and action on _____
    C.  This report is not approved.

RECEIVED
JUL 19 2007
Disability Services

_____                    _____
Signature of Director/Designee                           Date

9/1/90  cc:  __Director  __Principal  __Teacher  __Parent

6300 ALDERSON STREET, SCHOFIELD, WI 54476

INDIVIDUALIZED EDUCATION PROGRAM (Summary) Page 1 of 3

FORM E2

REDACTED

Name of student: Kirk Jenkins

Date of birth:

Sex: M

Grade: 3

Parent or legal guardian: David and Deanne Jenkins

Address:

Telephone Area/No.

District of placement-Cont. IEP Only

Home Attendance Area: Rothschild Elem

Service Location: Rothschild

Race/Ethnic *If parents choose to identify,* please circle.
White - Black - Hispanic - American Indian/Alaskan Native - Asian/Pacific Islander -Other

Amount of special education *Percentage of time or amount of time*(in minutes per week by EEN program)
LD: 20-40%

Extent to which student will participate in regular education programs: Recess, Art, Music, Phy. Educ., Guidance, Science, Social Studies, Math,

Related Services *Include specific amount of service*

Physical Education ☑ Regular ☐ Specially designed

Vocational Education ☐ Regular ☐ Specially designed

1. Beginning date of IEP 2/13/91 (mo./day/yr.) Ending date of IEP 6/6/91 (mo./day/yr.)

2. Beginning date of IEP 8/26/91 Ending date of IEP February 1992

Will student participate in standardized testing?

r. Third grade reading test ☑ Yes ☐ No ☑ With Modifications

s. Competency Based testing ☑ Yes ☐ No ☑ With Modifications

s. Achievement testing ☑ Yes ☐ No ☑ With Modifications

Justification for removal from regular education or regular education environment.

Due to academic delays Kirk can not successfully achieve in regular education.

Date of IEP meeting 2-7-91

IEP meeting participants

LEA Representative: [signature]

Special Education Teacher: [signature] Anderson

Parent/Guardian: David and Deanne Jenkins

IEP review date

IEP meeting participants

LEA Representative

Special Education Teacher

Parent/Guardian

Documentation of efforts to involve the parents in the IEP.

1)

2)

3)

_ Director(Original) _ Principal _ Teacher _ Parent

RECEIVED
JUL 1 9 2007
Disability Services

D. C. EVEREST AREA SCHOOL DISTRICT
6300 ALDERSON STREET, SCHOFIELD, WI 54476
INDIVIDUALIZED EDUCATION PROGRAM

FORM E

Date 2-7-91

Page 2 of 3

REDACTED

Name of student Kirk Jenkins | Date of birth — | Service Location Rothschild

Present levels of educational performance
Kirk presently functions at a beginning grade 2 level in the academic area of spelling.

Annual goal
Kirk will improve his ability to spell.

| Short-term Objectives | Objective Criteria | Procedures | Schedule |
|---|---|---|---|
| | EVALUATION | | |
| Kirk will improve his ability to spell Dolch list/GZB irregular word lists. | 60-80% mastery | direct instruction worksheet/ practice tests | 2 times/ week |
| Kirk will improve his ability to spell his address, birthdate, parents names, months of the year, days of the week and seasons. | ↓ | ↓ | 2 times/ week |
| Kirk will improve his ability to spell words with cvc, cvce, ccvcc, cvvc and multi-syllable words. | ↓ | ↓ | daily practice |
| Kirk will improve his ability to use a dictionary. | ↓ | ↓ | 2 times/ week |

Specific special education and related services which will contribute to meeting this goal:
Opportunities will be provided in self-contained spelling class.

Action taken on this goal at IEP review:

Date: ______

RECEIVED JUL 19 2007 Disability Services

9/1/90 cc: Director(Original) __Principal __Teacher __Parent

D. C. EVEREST AREA SCHOOL DISTRICT
6300 ALDERSON STREET, SCHOFIELD, WI 54476
INDIVIDUALIZED EDUCATION PROGRAM

FORM BJ

Date 2-7-91

REDACTED

Page 3 of 3

Name of student: Kirk Jenkins | Date of birth: | Service Location: Rothschild

Present levels of educational performance: Kirk presently functions at a mid-grade one level in the academic area of written language.

Annual goal: Kirk will improve his ability to write.

| Short-term Objectives | EVALUATION: Objective Criteria | Procedures | Schedule |
|---|---|---|---|
| Kirk will improve his ability to correct capitalization and punctuation of Grade One-Two Daily Sentences. | 60-80% mastery | direct instruction; teacher assessment; worksheet/ practice tests | daily practi |
| Kirk will improve his ability to use spelling list words in written sentences with correct capitalization and usage. | ↓ | ↓ | ↓ |
| Kirk will improve his ability to write 5 sentences given a topic. | ↓ | ↓ | ↓ |
| Kirk will improve Basic English abilities to grade 3 level. | ↓ | ↓ | ↓ |

Specific special education and related services which will contribute to meeting this goal:
Opportunities will be provided in self-contained language class.

Action taken on this goal at IEP review:

Date: ____

RECEIVED 1 4 2007 Disability Services

9/1/90 cc: Director(Original) __ Principal __ Teacher __ Parent

Parent Copy

D. C. EVEREST AREA SCHOOL DISTRICT
6300 ALDERSON STREET, SCHOFIELD, WI 54476
NOTICE OF INTENT TO PLACE AND CONSENT FOR PLACEMENT

FORM F
(Initial Onl
Page 1 of 2

Dear DR AND MRS JENKINS, Date 2-7-91

Based on the multidisciplinary team evaluation which was sent to you and the individualized education program developed on 2-7-91, the district offers to place your child KIRK JENKINS, in the special education program described below.

Part 1
(to be completed by placement group)

Type of program to be provided, including delivery model: RESOURCE PROGRAM FOR CHILDREN WITH LEARNING DISABILITIES

Program level: ELEMENTARY (WIDE RANGE)

Other special education options considered and reason(s) they were rejected REGULAR EDUCATION REJECTED SINCE KIRK'S LEARNING DIFFICULTIES REQUIRE MORE ASSISTANCE THAN WHAT REGULAR EDUCATION CAN PROVIDE

Placement justification, including reasons for any removal from the regular education environment. GIVEN KIRK'S LEARNING DEFICITS, REGULAR EDUCATION ALONE CANNOT ADEQUATELY AND APPROPRIATELY MEET HIS NEEDS.

Part 2
(to be completed by director/designee)

Location of program: Rothschild Elementary School

Documentation of consideration of least restrictive environment (LRE): As per part I which has been completed by district staff.

Please be sure to read the list of parent and child rights which are included with this notice. If you have any questions about this placement or your rights, please call Michael Gontarz at 359-3166.

[signature]
Signature of director/designee

RECEIVED
JUL 1 9 2007
Disability Services

These consents are currently in effect for your child:
Evaluation: given 12-7-90

3/1/90 cc: __ Director __ Principal __ Teacher __ Parent



1019050 5-194-442-9
6/29/07 (Reading Speciali

Fridley Public Schools
A World-Class Community of Learners

Lori TeeGardem
Reading Specialist
Fridley Middle School
6100 West Moore Lake Drive
Fridley, Minnesota 55432
School Phone: 763-502-5417
Summer Phone: 763-236-6953
School Fax: 763-502-5440

June 29, 2007

NBME Disability Services
3750 Market Street
Philadelphia, PA 19104

It is my greatest joy to write this letter on behalf of Kirk Jenkins, a student that I met in his third grade year at Rothschild Elementary School in Rothschild, Wisconsin. Kirk was identified with Learning Disabilities in grade three and became one of my most memorable students; to this date I tell my present students about Kirk noting his dedication and perseverance because he had specific goals that he wanted to meet and strived each day to attain them.

I have been a Learning Disabilities teacher for over 20 years and also have a masters' in Education Curriculum and a second masters' in Reading. At Rothschild Elementary I was the Learning Disabilities specialist for grades kindergarten through grade six. Presently I am a Reading Specialist for a middle school in Fridley, Minnesota and participate on reading panel level assessments for the state of Minnesota.

Kirk was referred for a learning disabilities assessment due to experiencing difficulties and frustrations with the academics of written language, spelling and reading. He was evaluated by Michael Gontarz the school psychologist and myself, Lori TeeGarden-Anderson, learning disabilities teacher. Both assessments were shared at the Multidisciplinary Team meeting that also included his grade three teachers, the school principal and both parents. Both assessments concluded difficulties in phonemic/phonics mastery, fluency, vocabulary, spelling and writing.

As defined by the International Reading Association there are five essential components of effective, research-supported reading instruction which are phonemic awareness, phonics, fluency, vocabulary and comprehension along with instruction components of spelling, writing, assessment and motivation. Extensive conversation discussing Kirk's need for reading instruction occurred at this meeting, with discussion elaborating that Kirk's assessments illustrate that he was not proficient in the components of phonemic/phonics, fluency and sight word vocabulary. Through motivation and perseverance he was able to within the regular mainstream setting display a level of comprehension however, the concept of "reader" was discussed and as a team it was agreed that Kirk did not possess the abilities to be a reader due to the other missing essential components. This discussion led to the decision as to which placement would best meet his needs and be within the least restrictive environment. The consensus was then that Kirk would remain in the

RECEIVED
JUL 1 9 2007
Disability Services

regular education setting for reading class only with the necessary additional support services or a learning disabilities setting for phonics, writing and supportive reading skills/strategies.

It was agreed by all M-team members that Kirk was in need of one-to-one instruction to best meet his educational needs in reading and spelling. This is also documented in the school psychologist's report, "Since Kirk is achieving success in the middle reading group, we should continue regular education for reading with close monitoring by the learning specialist. If he is no longer able to compensate in reading as he has been doing or if regular education can no longer meet his needs, then we can include reading on his IEP." This team reached a unanimous consensus that due to Kirk's significant learning delays in spelling and reading components that regular education alone could not adequately and appropriately address his limited learning style and significant instructional needs.

Extensive instruction centered upon the phonics component to support developing the skills of reading fluency. Spelling instruction was based upon the phonics approach and used specifically to support written composition and used to practice reading fluency. This instruction was primarily one-to-one instruction with occasional small-group practice sessions during a period of over 3 years. Kirk always gave his dedicated attention and effort to all instructional tasks and strived for his goal of becoming a "reader". That goal of becoming a "reader" was discussed at IEP reviews and at the beginning and closing of each school year to determine Kirk's academic progress and goals. Kirk was only able to participate within the mainstream of regular education reading classes because of the supportive-instruction that he was receiving from his placement in the Learning Disabilities classroom and the support of follow-through that he received at home. As by state mandates Kirk's placement had to be justified as being the least restrictive environment, thus he continued to receive support services from Learning Disabilities and remained in regular reading only with the accommodations and extensive support services that allowed that placement to continue. It is certain that if that support system were not in place Kirk would not have been able to progress with regular elementary education due to his substantially limited abilities in reading and spelling.

Please contact me with any further questions or concerns.

Sincerely,

Lori TeeGarden
Reading Specialist

RECEIVED
JUL 1 9 2007
Disability Services

1019049 5-194-442-9
Letter of Support-School

July 6, 2007

NBME Disability Services
3750 Market Street
Philadelphia, PA 19104

To Whom It May Concern,

I was Kirk Jenkins' teacher in the Montessori School of Wausau, WI, throughout his Preschool and Kindergarten years.

Kirk was a well-mannered, thoughtful child who excelled in the learning experience Montessori offers. He showed above average enthusiasm and intelligence in all areas of classroom activities, and was one of the leaders in my class.

However, when teaching him beginning reading skills, I began to notice some problems and eventual frustration from him. I questioned why he would have such difficulty learning names of letters and associating the letters with their sounds, when all of his other skills were above average. I subsequently spoke with his parents, and relayed my suspicion that he may have dyslexia. Kirk's parents were very supportive of my findings, and shared with me the fact that other family members were dyslexic. Because dyslexia is hereditary, this helped to confirm my suspicions. His parents and I felt that due to his young age and substantial support from both home and school, we would not have any professional testing done at this point. We decided to work one-on-one with Kirk and provide him with a strong phonic foundation. This strategy was strongly recommended then and currently even today remains essential for dyslexics learning to read.

As Montessori methodology allows for individual student exploration and choice, Kirk was able to spend long periods of time with me learning to read with the Phonics system. He was very aware that other children in the classroom were reading at a higher level than he was. In a Montessori classroom, there are mixed ages. Kirk's best friend in school was one year younger than he, and was quite far ahead of him in the series of phonics books and reading materials that we used. Kirk was extremely frustrated. It took a substantial amount of additional one-on-one work to get him to become willing to combat his impairment. In the one-on-one format only with significant positive reinforcement did he become willing to spend extra time working towards learning to read. This often took place during recess and even after school. I spent individual time with Kirk daily to help him read more fluently. I was also in contact with his mother often, in order to coordinate her efforts to work with him in the home.

The combination of intense individual attention at school and at home working on phonemes and decoding helped Kirk realize incremental improvements in reading. I have worked with many young children, some of whom also had learning disabilities or difficulties. The further we progressed, the more apparent it became that Kirk showed additional traits of dyslexia—difficulty decoding single words, inaccurate and labored oral reading, slow reading, and difficulty learning the letters of the alphabet and names of

RECEIVED
JUL 1 9 2007
Disability Services

numbers. His progress also reinforced that we had made the right decision to offer additional work in phonologic skills. Understand that Kirk did not suddenly become a good reader; he experienced incremental improvements through the additional reading sessions he and I worked through together that inspired him to continue. After leaving kindergarten his reading fluency was still significantly compromised, yet his brightness and perseverance allowed enough comprehension that he was not "turned off" from reading and learning.

Meeting Kirk again as a young man, I realize he still has the energy and drive to succeed against great odds. We as educators and life trainers must do all we can to help in this struggle, as it is those who have seen failure and still excel who become the compassionate men and women of our time.

Sincerely,

Carol Blevins

Carol Blevins

REDACTED

RECEIVED
JUL 19 2007
Disability Services

UNIVERSITY of LOUISVILLE
*Health Sciences Center*

Edward C. Halperin, MD, MA, FACR
Dean of the School of Medicine
Ford Foundation Professor of Medical Education
Professor of Radiation Oncology, Pediatrics, and History

University of Louisville
Abell Administration Center
323 East Chestnut Street
Louisville, Kentucky 40202-3866

Office: 502-852-1499
Fax: 502-852-1484
Web: www.louisville.edu

July 12, 2007

1019048 5-194-442-9
Letter of Support-Medical

Disability Services
National Board of Medical Examiners
3750 Market Street
Philadelphia, PA 19104-3190

Dear Sir/Madam:

Kirk D. Jenkins, one of our medical students, applied for and was denied testing accommodations related to dyslexia for USMLE Step 1. He is of appealing that decision. I would like to provide some background information on Mr. Jenkins and his experiences in the first two years of medical school at the University of Louisville.

When Mr. Jenkins applied for admission to the class entering in 2005, he was very forthright in providing documentation of his dyslexia and his life-long experience with it. He was first diagnosed as dyslexic in third grade, based on extensive testing. He has since undergone a wide range of testing several times and the results are all quite consistent. As a result of this definitive diagnosis, he has always been supplied with accommodations (normally time and a half and a quiet environment to take the examinations). He received these accommodations in grade school, high school, college and for the MCAT. His academic performance was good and we admitted him two years ago.

With Mr. Jenkins long-term and thorough documentation of dyslexia, we have provided him with testing accommodations throughout his first two years of medical school. He has passed all courses on the first attempt and is now ready to take USMLE Step 1 and then progress into the third year of medical school.

I would ask the NBME to give full consideration to his appeal to be provided accommodations for taking USMLE Step 1.

Sincerely yours,

Edward C. Halperin, M.D., M.A., F.A.C.R.
Dean, School of Medicine

ECH/ks

RECEIVED
JUL 1 9 2007
Disability Services